## DAVIS v. DISTRICT OF COLUMBIA.
### No. 591.

Municipal Court of Appeals for the District of Columbia.

May 14, 1948.

J. E. Bindeman, of Washington, D. C., for appellant.

Edward A. Beard, Asst. Corporation Counsel of Washington, D. C., (Vernon E. West, Corporation Counsel, and Chester H. Gray, Principal Asst. Corporation Counsel, both of Washington, D. C., on the brief), for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

Appellant was convicted in the Criminal Division of the Municipal Court of violating a regulation promulgated by the Minimum Wage and Industrial Safety Board of the District of Columbia pursuant to an act of Congress creating such board. Code 1940, Supp. V, § 36—402 et seq. The specific charge upon which the conviction resulted was that defendant used, or caused to be used by his employees engaged in painting a theater at Catholic University a ladder with wood side rails having a slope in the cross grain greater than the minimum safety standards provided for in the regulations. Attention was called to the alleged violation by the breaking of the ladder, which resulted in injury to two of appellant's employees.

Appellant assigns three fundamental grounds upon which his conviction should be reversed, namely: (1) that the trial court erred in admitting testimony of an inspector for the Minimum Wage and Industrial Safety Board upon the ground that he was not an expert on wood and ladders; (2) that the regulation involved was directed at ladder manufacturers and not against users of ladders who had taken reasonable precautions in their purchase; and (3) that the regulation was unreasonable as applied to appellant.

These contentions must be considered against the background of the act itself, the regulations adopted pursuant thereto, and the facts of this particular case. The statute authorizing the regulations was adopted in 1941. Its purpose, as stated in Code 1940, § 36—431, was "to foster, promote, and develop the safety of wage earners of the District of Columbia in relation to their working conditions." The Senate Committee on the District of Columbia in reporting the bill said:

"At a previous hearing on a similar bill before the House Subcommittee on Public Health, Hospitals and Charities of the Committee on the District of Columbia statistics showed that industrial accidents in the District of Columbia have been increasing in appalling numbers. For 1939 there were 26,647 nonfatal accidents and 50 fatalities. For 1940 there were 31,265 nonfatal accidents and 76 fatalities. The majority of the fatal accidents happened in construction work. It is believed that most of these accidents are due to lack of proper supervision and control over industrial projects and the lack of minimum safety requirements necessary to safeguard the health and life of industrial employees. It is also believed that a great number of these accidents could be avoided if proper safety measures were taken."[1]

The act authorized the board to "determine and fix reasonable standards of safety

[1] Sen. Rep. No. 675, 77th Cong., 1st Sess. (1941); see also H. R. Rep. No. 918, 77th Cong., 1st Sess. (1941); 87 Cong. Rec. 6010, 7459-7460, 7657-7658 (1941).

in employment, places of employment, in the use of devices and safeguards,. and in the use of practices, means, methods, operations, and processes of employment; promulgate general rules and regulations based upon such standards and fix the minimum safety requirements which shall be complied with by employers within the purview of this subchapter." Code 1940, § 36—433.

Following enactment of the statute and in accordance with its provisions, the board, consisting of one member representing employees, one representing employers, and one representing the public, held hearings which were duly advertised, and thereafter adopted regulations embodying safety standards for various branches of the building industry. Section 106 of such regulations provides that any employer of labor in connection with construction operations shall furnish, erect and maintain such equipment as may be necessary for the performance of such labor "in compliance with requirements of these standards." Part 3 refers specifically to ladders and contains various provisions regarding safe practices. Section 310 provides that, "all ladders shall be of such design, construction, and materials, and shall be so installed, used, and maintained as to afford reasonable safety to employees" and also that "ladders constructed, used, and maintained in accordance with the applicable provisions of 'The Safety Code for Construction, Care, and Use of Ladders,' approved by the American Standards Association, shall be prima facie evidence of compliance" with the requirements.

Appellant was charged specifically with violating Section 311-A-3-a, providing: "The general slope of cross grain in wood side rails of ladders built to minimum dimensions shall not exceed: One in 15 in portable ladders if rungs are used for steps."

The evidence upon which appellant was convicted consisted of the section of the ladder where the break occurred, and three photographs of longer parts of the ladder including the section where the break occurred; also the testimony of an inspector for the Industrial Safety Board.

 The testimony of this inspector is attacked on the ground that it was inadmissible because he was not qualified as an expert. His only significant testimony was that one of the side rails of the part of the ladder received in evidence showed a cross grain of one inch in five inches, which obviously represents a greater slope than one inch in fifteen inches. It was not disputed that this portion of the side rail came from the ladder supplied by appellant and used on the job in question. When bought by appellant the ladder was unpainted, but it had been painted by one of his employees as a preservative measure. Pointing to the breaks in this side piece where the raw wood was exposed, this witness showed to the court the fibers in the wood which crossed the ladder side piece, diagonally, so that in a distance of approximately five inches they moved away from the edge for one inch.

We believe the witness was sufficiently qualified to testify as to the limited subject matter under discussion. In addition to having been an inspector for the board for more than five years, he had been employed as a carpenter, iron worker and rigger for a large construction company for more than thirty years, had had charge of the equipment for that company, and was a member of both the carpenters' and iron workers' unions. The qualifications of a witness are generally for the trial court and under ordinary circumstances, such as the present, a ruling of the trial court on this subject will not be disturbed on appeal.[2]

 We believe also that the trial court ruled correctly in holding that the regulation was directed at the users of ladders, such as appellant, rather than at ladder manufacturers. This seems obvious from the history of the legislation, from the statute and from the regulations. Congress in such legislation obviously could not delegate to a local administrative board the power to regulate manufacturers who might be located in any part of the nation outside of the District of Columbia. The

[2] District of Columbia v. Chessin, 61 App.D.C. 260, 61 F.2d 523.

regulations do not refer to manufacturers or retailers; only to employers of labor in the District of Columbia.

We believe also that the legislation was reasonable as applied to appellant. The regulation was within the general authority of the Wages, Hours, and Safety Board, and under such circumstances the burden is upon appellant to demonstrate clearly that the rule is either beyond the delegated authority or is so unreasonable as to be void.[3]

It is not contended that the language used is vague or that it is impossible to determine a course of conduct to comply with the law. Rather, appellant asserts that the average painting contractor unaided, can not determine the meaning of these words. The words in themselves are not technical. Wood grain is a common term that should be familiar to every layman, and certainly is comprehensible to persons who handle lumber. "Cross grain" would seem to present little more difficulty. Webster's Dictionary describes cross-grained as "having the grain or fibers running transversely or irregularly." However, we are not limited to internal interpretation. Subsection 310 of the regulations states that ladders designed in accordance with " 'The Safety Code for Construction, Care, and Use of Ladders,' approved by the American Standards Association, shall be prima facie evidence of compliance * * *." Therefore we are entitled to consult this document to resolve real or supposed ambiguity of language. The American Safety Standards Code defines cross-grained wood as "that in which the fibers are not parallel with the axis, or longitudinal edges of the piece. It is expressed in this code as the slope of the grain with respect to the edges of the piece. For instance one (1) in twelve (12) means that in a distance of twelve (12) inches the grain deviates one (1) inch from the edge. The presence in any surface of local discontinuity of grain or local deviations in the straightness of grain because of knots permitted in the pieces shall be disregarded in applying the rules given herein." [4]

In the light of such definitive language there can be no doubt that the regulation presents an ascertainable standard. Appellant can not be heard to complain that he must act at his peril. At most he may say that he or painting contractors in general can not determine the meaning. Even if this were true, which we doubt, it is beside the point. Clearly it is within the power of Congress to impose upon an employer within the District of Columbia the duty of ascertaining at his peril whether or not his equipment complies with set minimum standards. We must hold that appellant has not sustained his burden of proving this regulation unreasonable either in general or in its application to him.

Appellant sought to show that another requirement of the regulations as to ladders, that wood used in the side rails should be dried to not more than a specified moisture content, was unreasonable, apparently seeking to imply that this made the entire regulation unreasonable. The implication does not follow from the premise. Because one part of a regulation or statute may be unreasonable, this does not invalidate reasonable portions. Obviously we are not called upon to pass on the reasonableness of other requirements since appellant has not been convicted of violating them. As to the requirement which he has been convicted of violating, we believe it obvious that anyone reasonably familiar with lumber can determine whether a specified sample violates the cross grain provision of the regulations at issue in the present case.

We have considered other points raised and find them to be without merit.

Affirmed.

---

[3] Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853.

[4] Section 3.1 (a) (2), American Standard Safety Code for Construction, Care, and Use of Ladders, American Standards Association, Apr. 11, 1935.