**HUTCHISON BROTHERS EXCAVATION
CO., Inc., a corporation, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 5540.

District of Columbia Court of Appeals.

Argued March 15, 1971.

Decided June 10, 1971.

Paul M. Rhodes, Washington, D. C., for appellant.

Ted D. Kuemmerling, Asst. Corp. Counsel, with whom C. Francis Murphy, Acting Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for appellee.

Before HOOD, Chief Judge, and KERN and GALLAGHER, Associate Judges.

GALLAGHER, Associate Judge:

This is an appeal from convictions for violating certain sections of the District of Columbia Construction Safety Standards, Rules and Regulations.[1]

A three-count information charged that appellant Hutchison Brothers, a corporation, (1) allowed to be operated a self-propelled, John Deere 450 loader, not equipped with a reverse signal alarm which would operate automatically with the start of and during backward motion of the vehicle in violation of Section 11–21111(a),[2] (2) failed to provide substantial overhead protection for the operator of that loader, when it was used in connection with excavating operations in violation of Section 11–21119(b),[3] and permitted employees on a construction project to work while not using approved head protection (hard hats or caps) in violation of Section 11–21024.[4] The trial court sitting without a jury found Hutchison Brothers guilty of each offense and sentenced it to pay a fine of $200.[5]

---

1. Safety Standards, Rules and Regulations —Construction (effective August 1, 1968).

2. Section 11–21111(a) provides:
   All self-propelled equipment shall be equipped with a reverse signal alarm which shall operate automatically with the start of, and during, backward motion. Panels, pickups, station wagons, crawler-type cranes, and power shovels are exempted.

3. Section 11–21119(b) provides:
   Substantial overhead protection shall be provided for the operator when equip-

ment is used in connection with excavating or clearing operations, and when falling or flying objects are a hazard.

4. Section 11–21024 provides:
   HEAD PROTECTION. Hard hats of a type approved by the Board shall be provided for, and used by, all employees on construction projects with the exception of employees engaged in minor remodeling, repair, installation, or maintenance operations being performed on existing structures.

5. The record is unclear on the sentence. At the conclusion of the trial, the court

The evidence established that a safety inspector for the District of Columbia Industrial Safety Division, visited a building construction site at 1900 Pennsylvania Avenue, N.W., for a routine safety inspection. He testified that, during a fifteen minute observation, he saw a John Deere 450 loader (hereafter loader) being operated by one of appellant's employees without an overhead protective canopy and with an inoperative reverse signal alarm. An overhead crane with a bucket of concrete was swinging back and forth over the path of the loader. A photograph of the site showing the loader and crane was admitted into evidence. In addition, the safety inspector observed a truck driver employed by appellant at the construction site not wearing a hard hat while in the excavation.

■ Appellant asserts the loader admittedly had a back-up signal and there was no proof appellant knew it was inoperative; also, says appellant, it should have been given a reasonable opportunity to make repairs. Further, as to the absence of a canopy over the driver of the loader, it contends the regulation requires such protection only if the equipment is used in connection with excavation when danger from falling objects is a hazard; and the information did not charge that such a hazard existed at the time of this violation nor was appellant permitted to question the driver to ascertain if there was a danger of falling objects. Lastly, appellant says it showed without contradiction that its employees were furnished "hard hats" and that it posted a notice requiring that they be worn and instructed workers to wear

them when they were observed without them.[6] Appellant's overall position is that the trial court imposed liability without "the traditional requirement that the defendant * * * made a conscious choice to do the acts constituting the violation", and consequently, under the circumstances of this case, the regulations were applied unreasonably.

■ The photograph of the site shows the loader was being operated without a canopy while the construction was at a stage where overhead cranes were installed; in fact, the photograph shows the loader virtually underneath one of the cranes. We agree that the government should have charged in the information that there was at that time a danger of falling objects. We also agree that appellant's attorney should have been permitted to question the driver concerning whether this danger then existed. But, on this record, we do not view these as serious errors. It is all too apparent that the regulation required a canopy on the loader under the conditions existing at the time the inspector observed the project. Also, it is uncontested that the reverse signal alarm on the loader was inoperative and that the inspector viewed the project for fifteen minutes before going into the excavation site to announce the violations.

Turning to the contention on unreasonable application of the regulations, the penalty provision of the statute under which the regulations were promulgated provides in part:

Whoever violates any of the provisions of this subchapter, or any rules or

announced a sentence of a $200 fine on each charge. The judgment itself shows "$200.00 or ten (10) days each; consecutively. Total $600.00 or 30 days." Since the defendant is a corporation and because the fines were paid (*see* note 6, *infra*), we treat the sentence as being a fine only.

6. The government contends this appeal should be dismissed as untimely as the notice of appeal was filed one day late.

It has been demonstrated, however, that there was a clerical error and this assertion is inaccurate, and it was filed in time. The government also contends the appeal should be dismissed as moot because the fines have been paid. Under the circumstances of this case, we disagree if only because it is apparent that an employee, not an officer of the corporation, who was present at the trial was required by the court to pay the fines on the day the trial ended.

regulations promulgated hereunder, shall be deemed guilty of a misdemeanor; and, upon conviction thereof, shall be punished by a fine of not more than $300, or by imprisonment of not exceeding ninety days * * *.

D.C.Code 1967, § 36–442. Congress omitted the word "knowingly" in that provision.

■ Where the peculiar nature of the legislation requires an effective means of regulation, such legislation may dispense with the conventional requirement for criminal conduct, *i. e.*, awareness of some wrongdoing. Morissette v. United States, 342 U.S. 246, 252–262, 72 S.Ct. 240, 96 L. Ed. 288 (1952); United States v. Dotterweich, 320 U.S. 277, 280–281, 64 S.Ct. 134, 88 L.Ed. 48, reh. denied, 320 U.S. 815, 64 S.Ct. 367, 88 L.Ed. 492 (1943). This is especially true of "public welfare" offenses.[7] When a statute is silent on this element, it becomes a question of legislative intent to be construed by the court. United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L. Ed. 604 (1922); Cohen v. United States, 378 F.2d 751, 756 (9th Cir. 1967). And in "construing an act with broad remedial purposes, a court should give a liberal interpretation to protective provisions while narrowly interpreting exceptions from such provisions. *See, e. g.,* United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943)." United States v. Articles of Drug, Thyrodig Tablets, 306 F. Supp. 247, 251 (D.Colo.1969).

The statute authorizing the regulations challenged here was adopted in 1941. Its purpose is "to foster, promote, and develop the *safety* of wage earners of the District of Columbia in relation to their working conditions." D.C.Code 1967, § 36–431. (Emphasis added.) In reporting the bill, the Senate Committee on the District of Columbia gave some insight into Congress' intent when it said:

At a previous hearing on a similar bill before the House Subcommittee on Public Health, Hospitals and Charities of the Committee on the District of Columbia statistics showed that industrial accidents in the District of Columbia have been increasing in appalling numbers. For 1939 there were 26,647 nonfatal accidents and 50 fatalities. For 1940 there were 31,265 nonfatal accidents and 76 fatalities. *The majority of the fatal accidents happened in construction work.* It is believed that *most of these accidents are due to lack of proper supervision and control over industrial projects* and the lack of minimum safety requirements necessary to safeguard the health and life of industrial employees. It is also believed that a great number of these accidents could be avoided if proper safety measures were taken.[8] (Emphasis added.)

Congress was aware of the dangers involved in construction work when it authorized the District of Columbia Minimum Wage and Industrial Safety Board to promulgate regulations to implement the statute and when it enacted the penalty provision. The legislative history shows that Congress knew "[t]he industrial revolution multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers", Morissette v.

---

7. "The term, 'public welfare offense,' is used to denote the group of police offenses and criminal nuisances, punishable irrespective of the actor's state of mind, which have been developing in England and America within the past * *. * century * *." Sayre, Public Welfare Offenses, 33 Colum.L.Rev. 52, 56 n. 5 (1933). These are basically violations of police regulations that are punishable without proof of individual blameworthiness and which therefore present an exception to the general established doctrines of the criminal law. *Id.* at 70.

8. Sen.Rep.No.675, 77th Cong., 1st Sess. (1941); *see also* H.R.Rep.No.918, 77th Cong., 1st Sess. (1941); 87 Cong.Rec. 6010, 7459–7460, 7657–7658 (1941).

United States, *supra*, 342 U.S. at 253, 254, 72 S.Ct. at 245, and that "the demands of an increasingly complex social order required additional regulation of an administrative character unrelated to questions of personal guilt * * *." Sayre, *supra* note 7, at 67.

The prosecution in this case is based on the type of legislation where penalties serve as effective means of regulation. "Such legislation dispenses with the conventional requirement for criminal conduct —awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." United States v. Dotterweich, *supra*, 320 U.S. at 281, 64 S.Ct. at 136. "The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." *Id.* at 280, 64 S.Ct. at 136.

In Davis v. District of Columbia, D.C. Mun.App., 59 A.2d 208, 211 (1948), this court in reviewing and affirming a conviction of an employer under a regulation dealing with the cross grain required on ladders used by employees, stated:

> Clearly it is within the power of Congress to impose upon an employer within the District of Columbia the duty of ascertaining *at his peril* whether or not his equipment complies with set minimum standards. * * * (Emphasis added.)

It is evident this court considered that the legislation and the regulations thereunder dispensed with the *scienter* element. The whole scheme of regulation is directed at the employer and the emphasis is upon "achievement of some social betterment rather than the punishment of * * * crimes * * *." United States v. Balint, *supra*, 258 U.S. at 252, 42 S.Ct. at 302.

■ Since Congress used no words bearing on specific intent in the penalty provision (§ 36–442), this element is not a part of the government's burden of proof with regard to § 11–21111(a) (reverse signal alarm) and § 11–21119(b) (overhead protection—canopy). Put differently, the government need not prove appellant knew of those violations. Appellant relies on Boyce Motor Lines v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952), in support of its contention that, to be reasonable, the regulation must require a knowing violation by the employer. But *Boyce* is distinguishable because there, unlike here, the statute involved explicitly required knowledge on the part of the employer.

Since the government proved that the loader was being used in connection with excavating operations and that falling or flying objects were a hazard (the buckets full of concrete being swung by the crane over the path of the unprotected loader) in violation of § 11–21119(b) and that the loader was not equipped with a functioning reverse signal horn in violation of § 11–21111(a), those judgments are affirmed.

■ The conviction for violating the "hard hat" regulation (§ 11–21024) stands on different ground. While it is doubtless competent for Congress to create strict criminal liabilities in this area by defining crimes without any element of *scienter* that power is not without limitation. *See* Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), reh. denied, 355 U.S. 937, 78 S.Ct. 410, 2 L.Ed.2d 419 (1958). In the other two situations with which we have just dealt the employee may be virtually helpless. It is the employer who must provide the canopy for the protection of the driver and the reverse signal alarm for the protection of other employees. These violations hinge on the protected group's inability to protect itself. This is not the case with hard hats. The employee himself has ultimate control and determines in the final analysis whether he is or is not afforded protection by his hard hat. Reasonably construed, the pertinent regulation places upon the employer the obligation to issue the hard hats, require their use, post signs requiring employees to

wear them and exercise care in seeing that they are worn. We recognize that § 11–21023 dealing with "Personal Protective Equipment" provides in part:

> Each employer shall be responsible for employees using personal protective equipment and/or clothing whenever the employer has knowledge of hazards listed in (a).[9]

But we construe that section as requiring conviction under the statute only if the employer knew or reasonably should have known an employee was not wearing the issued hard hat, and did nothing to correct the situation. Were the regulation not read in this manner it would impose an impermissible burden on the employer in light of the employees' ability to provide for their own safety once issued the protective hats and instructed to wear them. We think this is a reasonable construction in light of the subject matter of the enactment and will afford the protection sought by Congress and the District of Columbia Council.

■ The evidence established that the truck driver, an employee of Hutchison Brothers, was at the construction site and in the excavation without a hard hat. The length of time he was without a hard hat does not appear substantial; nor does it appear that the employer reasonably should have known the driver was not wearing his hard hat. Under these particular circumstances, a conviction was not established under the test we have related.

Our ruling with regard to the hard hat regulation (§ 11–21024) is not to be construed by employers and those in positions of supervision and control at construction sites that they may slacken surveillance. If the facts in a given case establish that a particular employee went without the hard hat frequently or for an unreasonable period on any occasion, these would be questions to be submitted to the trier of fact for its evaluation under the standard we have announced.

The convictions for violating § 11–21111(a) and § 11–21119(b) are affirmed, and the conviction for violating § 11–21024 ("hard hats") is reversed.

Affirmed in part, reversed in part.

9. Among the hazards listed in subsection (a) are falling or flying objects.