Lee D. MARTIN et al., Appellants,

v.

GEORGE HYMAN CONSTRUCTION COMPANY, Appellee.

No. 12356.

District of Columbia Court of Appeals.

Argued March 8, 1978.

Decided Nov. 21, 1978.

Wayne M. Mansulla, Alexandria, Va., for appellants.

Walter J. Murphy, Jr., Wheaton, Md., for appellee George Hyman Construction Company. J. Harry Welch, Wheaton, Md., also

1. While both appellants, husband and wife, are parties to this appeal, the wife's rights are, in the factual context of this case, premised upon appellee's liability to the husband. Because no issue is raised with respect to the wife's derivative liability, we refer herein only to the husband.

2. Other parties at trial were a third-party defendant, impleaded by Hyman, and a fourth-

entered an appearance for George Hyman Const. Co.

Before KELLY, NEBEKER and FER-REN, Associate Judges.

NEBEKER, Associate Judge:

Appellant [1] asserts that the trial judge erred in directing a jury verdict for appellee (hereinafter, Hyman) [2] at the close of appellant's evidence upon a negligence action. We agree, and thus we reverse and remand for a new trial.

Appellant introduced evidence from which the jury could have found the following circumstances. Appellant was an ironworker employed by a subcontractor of Hyman, the general contractor on a building under construction during the period relevant to this case. A steel staircase had been put into place between the ground level floor, which was concrete-decked, and the next higher level, which was plywood-decked. The treads of this staircase were formed with a vertical protruding lip designed to contain the concrete necessary to form a flat tread surface when the staircase was completed. Appellant had used a ladder to ascend to the plywood level during the course of his work, but he used the steel staircase to descend to the cement level. In the course of his descent, he caught his heel on the protruding lip of one of the treads, fell, and injured himself.

Appellant premised his negligence action upon the general allegation that Hyman breached its statutory duty to provide reasonably safe working conditions [3] and, more particularly, a specific duty of care assertedly imposed by §§ 11–21090 and –21091(f) of the District of Columbia Safety Standards, Rules and Regulations—Construction. Section 11–21090 provides:

party defendant impleaded by the third-party defendant. Both impleading claims were dismissed in the trial court as moot.

3. D.C.Code 1973, § 36–438(a) provides, in part, that "every employer shall furnish a place of employment which shall be reasonably safe for employees . . . .

**66**

In the construction of buildings, a stairway—either permanent or temporary—shall be installed to each floor as soon as practicable. The stairways shall be maintained throughout the height of the building during all construction operations.

Section 11–21091(f) provides:

Stairways with steel treads and landings, which are later to be filled in with concrete or other tread surfacing, shall be provided with temporary wood treads carefully fitted in place and extending to the edge of the metal nosing and over the entire surface of the treads and landings. Skeleton iron stairs shall have wood treads not less than 1 inch in thickness.

These regulations "apply to construction projects, equipment, and operations in the District of Columbia for the purpose of safeguarding the wage earners on such projects . . . ." *Id.* § 11–21001. It is undisputed that, at the time appellant was injured, wood fillers had not been inserted in the steel treads.

The bases for the trial court's direction of a verdict for Hyman were, first, that the regulations cited had not yet become applicable to the stairs in this case because they were not yet either "substantially completed" or turned over by Hyman for general use; and, second, that appellant was barred from recovery upon the general duty to maintain safe working conditions by his own negligence or assumption of the risk.

## I

The trial court's premise that the regulations became applicable only after the stairs had been, to some degree, "completed" is eminently reasonable. During their erection, for example, it is reasonable to assume that the stairs may be walked upon by ironworkers (who erect them) for that purpose, not for the purpose contemplated by the regulations, of ascent or descent in the course of other work. The pivotal question, therefore, is at what stage a staircase has become sufficiently completed to bring into

force the safety regulations. On this question, the trial court heard and adopted, for the purpose of its ruling, the testimony of Mr. Charles Green, Director of Safety for the District of Columbia Minimum Wage and Industrial Safety Board, the agency which published the regulations. Mr. Green was proffered by appellant as an expert witness upon the applicability of the regulations to the instant factual situation. Mr. Green was not, however, permitted to testify as an expert. Rather, the trial court heard his testimony out of the presence of the jury[4] and later indicated that, insofar as relevant, the testimony was accepted as an aid in construction of the regulations—*i. e.,* as going to a legal rather than a factual issue. On the basis of this testimony, the court concluded that the regulations would become applicable only after the staircase had become "substantially completed" and had been "turned over to workers for their use" by Hyman.

We need not decide whether the deference given Mr. Green's testimony by the trial court was warranted by the general principle that agency interpretations "are entitled to weight . . . unless plainly unreasonable or contrary to ascertainable legislative intent." *Williams v. W. M. A. Transit Co.,* 153 U.S.App.D.C. 183, 189, 472 F.2d 1258, 1264 (1972) (interpretation of statute by implementing regulation and formal opinion of the Corporation Counsel). Rather we accept, *arguendo,* this construction of the regulations and proceed to consider the factual basis for the directed verdict.

Uncontradicted evidence with respect to the "completeness" of the stairs was that the wooden treads had not been installed and that the stairway lacked handrails. The absence of the wooden treads becomes relevant only after a determination is made on the degree of completion of the stairway. If the stairway was substantially complete, the lack of wooden treads breaches the statutory duty; if the stairs were not

---

4. Although Mr. Green was thereafter permitted to testify before the jury as a lay witness, that testimony is not relevant to this issue.

substantially complete, no standard of care is violated. Therefore, in this case, presence or absence of wooden treads is extraneous in ascertaining the completeness of the stairs. Similarly, we cannot say that, as a matter of law, the absence of handrails is conclusive upon the factual question of whether the stairway was "substantially complete." Section 11–21092(b) of the cited regulations provides that "[s]tair railings shall be provided immediately after stairways are stripped or as soon as metal or temporary stairways are erected." The regulation contemplates that stairways may be erected before handrails are installed but requires the protection of handrails in contemplation of their use. Assuming, *arguendo*, that this regulation and the regulations respecting wooden treads should be construed *in pari materia*,[5] then the duty to install handrails would, under the trial court's construction of the stairway regulations, arise only after the stairway had become "substantially complete." It would be erroneous to reason that the duty to install wooden treads does not arise in this case because handrails had not yet been positioned, since the duties to install both apparatus arise concurrently. Accordingly, appellee's argument to this effect fails.

■ Hyman argues that the stairway could not, as a matter of law, be regarded as "substantially complete" because certain evidence, introduced by appellant, showed that appellant, an iron worker, was still engaged in construction of the stairway in question. The only evidence on this point, however, was that appellant was engaged in plumbing columns for a stairway. Yet it is unclear from the record whether the stairway being worked on was that from the plywood-decked level (where appellant was working) to the next higher level or

that from the plywood-decked level descending to the concrete level. In reviewing the record for the sufficiency of appellant's evidence, we must read the record in the light most favorable to him. *Gaither v. District of Columbia*, D.C.App., 333 A.2d 57, 59 (1975); *Calloway v. Central Charge Service*, 142 U.S.App.D.C. 259, 440 F.2d 287 (1971). It was for the jury, not the trial court, to resolve this ambiguity in Hyman's favor.

■ In contrast to this evidence cited by Hyman, appellant introduced other evidence which, if believed by the jury, would have established that the stairway was both substantially complete and turned over for the use of workers. Appellant's evidence was that the staircase was a prefabricated unit which had been plumbed and secured in place. This was sufficient to place before the jury the factual issue of whether the stairway was substantially complete. In addition, Hyman's own building supervisor testified that "[w]hen we completed our stairs and safety to a certain level, we put a barricade across the top of that [stairway]." The purpose of the barricade was "to prevent . . . anybody that had no function in the building or . . . on those steps from moving on up." Other testimony tended to establish that there had been a barricade to prevent ascent from the plywood-decked level but that there was none to prevent descent from that level. The jury, therefore, was entitled to consider whether Hyman had completed its stairs to the plywood-decked level (but not above that level) and whether Hyman had, by placing a barricade above that level, indicated the availability for use of the descending stairway upon which appellant fell.[6]

---

5. Absent such a construction, the plain words of the regulation would govern, imposing an immediate duty independent of the contractor's intent to permit workers to use the stairs—a construction less favorable to Hyman.

6. The trial court concluded that, because there was no evidence that Hyman had notice that a barricade had been removed from the stairway in question, it could not be held to have turned

it over for the use of workers or to have breached its general duty to provide a safe working place. In *John B. Kelly, Inc. v. Dunnett*, 130 U.S.App.D.C. 150, 397 F.2d 711 (1968), the court held that an unexplained absence of a safety device (a scaffolding board) which had been in place twenty minutes earlier did not afford a basis for finding a breach of the duty to provide safe working conditions. But here, unlike *Dunnett*, there was no evi-

The trial court also held that appellant was barred from recovery based upon Hyman's general statutory duty to maintain safe working conditions because, as a matter of law, appellant was contributorily negligent or had assumed the risk of Hyman's negligence.[7] Because the trial court had ruled that appellant had not borne his burden of proof to show that the safety regulations had become applicable, it did not rule that either of these defenses would bar recovery for injuries caused by breach of the duty imposed by these regulations—an issue addressed by both parties upon this appeal.

Our ultimate disposition of this case is remand for a new trial. Therefore, since retrial of this case will likely require that the trial court instruct the jury on the effect of appellant's own conduct upon his recovery for Hyman's alleged breach of these safety regulations, as well as on recovery for Hyman's alleged breach of the general duty to maintain safe working conditions, we will address both issues. Section II of this opinion deals with the general applicability of the defenses of contributory negligence and assumption of risk to actions premised upon breach of our employment safety statute and regulations thereunder. Part III treats the applicability of these defenses to the instant case.

## II

### A. *In General*

No binding precedent has dealt squarely with the issues raised here. The general rule established by our precedents is clear: either defense of assumption of risk or contributory negligence is, in general, a complete bar to recovery. *See, e. g., Willis v.*

*Stewart,* D.C.App., 190 A.2d 814 (1963); *Harris v. Plummer,* D.C.App., 190 A.2d 98 (1963); *S. S. Kresge Co. v. Kenney,* 66 App. D.C. 274, 86 F.2d 651 (1936). None of the cases establishing this rule, however, distinguishes between claims based upon a common law duty of care and those based upon breach of a legislative or regulatory standard of care. Likewise, not one of the cases holds that the latter claims are barred by these defenses. Finally, neither *Hewitt v. Safeway Stores, Inc.,* 131 U.S.App.D.C. 270, 404 F.2d 1247 (1968) (assumption of risk does not bar recovery under safety statute) nor *Bowman v. Redding & Co., Inc.,* 145 U.S.App.D.C. 294, 449 F.2d 956 (1971) (ordinary contributory negligence does not bar recovery under safety regulation) serves as binding precedent establishing a different rule where violation of a safety statute or regulation is alleged; *Hewitt* was decided under the law of Maryland, and *Bowman* was decided after the effective date of the reorganization of the courts of the District of Columbia. *See M. A. P. v. Ryan,* D.C. App., 285 A.2d 310, 312 (1971). The question, therefore, is an open one, the resolution of which will not require the overruling of precedent.

The nearly universal rule is that neither contributory negligence nor assumption of risk bars recovery for breach of a duty imposed by statute, ordinance, or regulation if the purpose of the statute, ordinance, or regulation would be defeated by application of either defense. *See* Restatement (Second) of Torts §§ 483, 496F (1965); W. Prosser, Law of Torts 425–26, 453–54 (4th ed. 1971). As early as 1939, Judge Augustus N. Hand was able to note (and hold) that

---

dence that a barricade had ever been erected to prevent access to the stairway in question. *See H. R. H. Construction Corp. v. Conroy,* 134 U.S.App.D.C. 7, 9–10, 411 F.2d 722, 724–25 (1969). Moreover, the evidence here was fairly susceptible of the reading that only one barricade was emplaced at any one time and that the erection of a barricade at one level—implying completion to that level—resulted in the removal of any barricade below that level as unnecessary.

7. Because appellant was the employee of Hyman's subcontractor rather than of Hyman, a workmen's compensation claim was not available against Hyman. D.C.Code 1973, § 36–501, *incorporating* 33 U.S.C. c. 18 (1970); *see Liberty Mut. Ins. Co. v. Cardillo,* 81 U.S.App.D.C. 72, 74, 154 F.2d 529, 531 (1946), *rev'd on other grounds,* 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947). Such a claim would not be barred by contributory negligence nor assumption of risk. 33 U.S.C. § 905(a) (Supp. V 1975).

[t]he better reasoned decisions have held that assumption of risk and contributory negligence . . . are not valid defenses in cases where the violation of a statute enacted for the benefit of a class of which the plaintiff is a member is involved. [*Osborne v. Salvation Army*, 107 F.2d 929, 931 (2d Cir. 1939).]

Statutes and regulations should not be overborne by the common law. The common law was developed to fill the gaps between such non-judicial expressions of policy. Deference to the statutes and regulations is inherent in the separation of the branches of our government.

The common-law doctrines of reasonable care, assumption of risk, contributory negligence, and co-service took their rise at a time when shoes were made at the bench, the weaver had an apprentice or two, and the blacksmith a helper. . . . The courts cannot abolish the old rules and adopt others which shall suit existing facts and remedy existing evils. That must be done by the Legislature. But when tardy statutes are promulgated, the courts should interpret them as favorably as their terms will allow, and not proceed to shackle them with the discredited common-law manacles. [*Caspar v. Lewin*, 82 Kan. 604, 631–32, 109 P. 657, 667 (1910).]

Therefore, where the judicially-developed defenses of contributory negligence and assumption of risk conflict with the purposes of the statutes and regulations, such defenses should not bar recovery.

■ To so state, however, is the beginning, not the end of our inquiry. The defenses of contributory negligence and assumption of risk may not conflict with the benefit intended by the statute or regulation. Moreover, the conflict between an intended statutory benefit and one of the defenses does not ipso facto bar the other defense. The effect of a statute or regulation depends upon analysis not only of the policies of the enactment but also the relation of those policies to each of the defenses individually.

## B. *Contributory Negligence*

■ Contributory negligence is based upon a plaintiff's actions or omissions; if those actions or omissions are unreasonable and contribute to the injury, then they are deemed by the law to be the proximate cause of the injury. *S. S. Kresge Co. v. Kenney, supra*, 66 App.D.C. at 275–76, 86 F.2d at 652–53. Contributory negligence does not deny the negligence of the defendant but merely precludes recovery to a plaintiff who, in effect, failed to take due care for his own well-being. *See* Prosser, *supra* § 65 at 417.

■ The effect of a statutorily or regulatorily imposed duty of care upon this defense will vary with the intended purpose of the duty. Thus, a statute or regulation may impose a duty of care without increasing the protection due to the protected class. In *Dougherty v. Chas. H. Thompkins Co.*, 99 U.S.App.D.C. 348, 240 F.2d 34 (1957), for example, the city, not the land occupier, was under a duty to maintain adjoining sidewalks in a reasonably safe condition. The occupier of the land blocked the sidewalk for its own purposes, thereby becoming subject to an administratively imposed duty to maintain a temporary sidewalk "in good repair and free from rubbish, dirt, and snow . . . ." *Id.* at 349, 240 F.2d at 35. Although the court did not specifically address the effect of this regulation upon the defense of contributory negligence, it might be inferred that the regulation intended no greater protection for the users of the sidewalk but merely shifted the duty of protection from the city to the land occupier. On the other hand, a statute or regulation may, as in the case of traffic regulations, serve only "to clarify and define the elements of due care." *Bowman v. Redding & Co., Inc., supra*, 145 U.S.App.D.C. at 304, 449 F.2d at 966. In neither case would the defense be affected.

■ On the other hand, a statutory or regulatory scheme may envision that certain classes of persons likely to be careless require greater protection than that which might be afforded at common law. For example, the negligence of children is often

held no bar to their recovery upon the defendant's breach of a duty imposed to protect them from their own negligence. *See, e. g., Van Gaasbeck v. Webatuck Cent. School Dist. No. 1,* 21 N.Y.2d 239, 287 N.Y. S.2d 77, 234 N.E.2d 243 (1968) (failure of school bus driver to instruct children on manner of crossing street); *McMillen v. Steele,* 275 Pa. 584, 119 A. 721 (1923) (sale of weapon to minor who is thereby injured). Such protective policies often appear in legislation affecting children and in measures protecting workers from unsafe working conditions. *See, e. g., Bowman v. Redding & Co., Inc., supra; Schultz v. Henry Ericsson Co.,* 264 Ill. 156, 164, 106 N.E. 236, 239 (1914) ("The object to be attained by this [safety] statute was to prevent injuries to persons employed . . . , so that negligence on their part in the manner of doing their work might not prove fatal."); *Evansville Hoop Co. v. Bailey,* 43 Ind.App. 153, 159, 84 N.E. 549, 551 (1908), *quoted with approval in Caspar v. Lewin, supra,* 82 Kan. at 633, 109 P. at 668 (factory act "evidently designed to protect the employee, not only from unavoidable accidents, but from his own negligent and careless acts"); *Stern v. Great Island Corp.,* 250 App.Div. 115, 116, 293 N.Y.S. 608, 611 (1937) ("very purpose of the [Labor Law] was to protect [workers] . . . from the consequences of their own negligence"). In each case, contributory negligence of workers was held to be no defense.

D.C.Code 1973, Title 36, Subchapter II ("Industrial Safety") imposes a general duty to maintain "reasonably safe" conditions of employment (*id.* § 36–438(a)) and provides for the adoption of regulations which more specifically define this duty. *Id.* § 36–433. This statutory duty of due care is broader than its common law counterpart because it is incumbent not only upon employers as defined at common law but also upon "every person . . . having control or custody of any industrial employment, place of employment, or of

any employee" (*id.* § 36–432(a) (definition of "employer")).[8] However, the fact that a greater number of persons might owe a duty does not mean that a greater duty is owed. *See Clarke v. O'Connor,* 140 U.S. App.D.C. 300, 306–07, 435 F.2d 104, 110–11 (1970) (regulation imposing duty upon landlord "to make a premises . . . healthy and safe" establishes only common law standard of due care). Yet, the term "safe" as used in this subchapter ("reasonably safe" conditions of employment) has been defined broadly. The language of the Code itself admonishes us that the term "shall not be given restrictive interpretation so as to exclude any mitigation or prevention of a specific danger." D.C.Code 1973, § 36–432(c). Additionally, we have held that the administratively imposed safety regulations which more specifically define this general duty of care are not limited by the common law standard of "reasonableness" but, rather, are valid unless "so unreasonable as to be void." *Davis v. District of Columbia,* D.C.Mun.App., 59 A.2d 208, 211 (1948) (footnote omitted).

The congressional purpose in imposing this greater duty of care toward wage earners is evident from the legislative history of the subchapter. Congress was concerned with the "appalling numbers" of wage earners injured in employment-related "accidents." H.R.Rep. No. 918, 77th Cong., 1st Sess. 2 (1941); S.Rep. No. 675, 77th Cong., 1st Sess. 2 (1941). The congressional determination that "most of these accidents are due to lack of proper supervision and control" (*id.*) is an implicit recognition that wage earners will not always exercise due care for their own safety. Finding that these accidents "could be avoided if proper safety measures were taken" (*id.*), Congress imposed upon employers (as broadly defined) the sole responsibility for avoiding those accidents. In so doing, Congress established a new standard of care which encompasses and supercedes the foreseeable

---

8. Contrast the construction of terms "employer" and "employee" under our workmen's compensation law, D.C.Code 1973, § 36–501. *See Liberty Mut. Ins. Co. v. Cardillo,* 81 U.S.App.

D.C. 72, 74, 154 F.2d 529, 531 (1946), *rev'd on other grounds,* 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947).

and, practically speaking, inevitable lack of care on the part of wage earners; a standard designed "to foster, promote, and develop the safety of wage earners . . ." D.C.Code 1973, § 36–431. This standard requires the exercise of due care for the prevention not only of injuries to which wage earners do not contribute but all "accidents" which might be avoided by the employer's care. *See generally* 87 Cong. Rec. 7658 (1941) (remarks of Rep. Randolph) (purpose of legislation is "accident-prevention"). To hold that a wage earner's contributory negligence is a defense for the employer would impermissibly ignore the congressionally imposed duty. This court is not free to disregard the command of Congress nor to frustrate its unequivocal intent.

We therefore hold that the contributory negligence of a wage earner [9] does not bar recovery based upon an employer's breach of the statutory duty to provide reasonably safe working conditions for wage earners. It is immaterial whether that duty derives from the general language of the statute (D.C.Code 1973, § 36–438(a)) or from the provisions of a rule or regulation adopted pursuant to D.C.Code 1973, § 36–433.

The unavailability of the defense of contributory negligence does not, however, mean that the wage earner's conduct is irrelevant under all circumstances. Where, for example, the wage earner's conduct exceeds ordinary contributory negligence and constitutes "that aggravated form of negligence, approaching intent, which has been characterized variously as 'willful,' 'wanton,' or 'reckless,'" Prosser, *supra* at 426 (footnote omitted), the wage earner will be barred from recovery. We agree with the opinion in *Bowman v. Redding & Co., Inc., supra,* 145 U.S.App.D.C. at 304, 449 F.2d at 966, that "[a] safety system can be required to foresee and guard against the probability of occasional carelessness without having to extend protection to the case of reckless folly."

## C. *Assumption of Risk*

Assumption of risk occurs when a plaintiff voluntarily consents to incur a risk. The consent may be express, as in the case of a contractual absolution from liability,[10] or implied by conduct.[11] The risks of an activity may be assumed in advance, in which case only those risks which were reasonably foreseeable and, therefore, contemplated by the consent are assumed.[12] Also, the risk of a specific danger which is already in existence and known and appreciated by the plaintiff may be assumed.[13]

In cases where the defendant is charged with negligence, the defense operates to relieve "all legal duty [of the defendant] to the plaintiff; and being under no duty, he [the defendant] cannot be charged with negligence." Prosser, *supra*

9. We need not address whether and, if so, under what circumstances, a person other than a wage earner might be an intended beneficiary of these safety regulations, *compare Kurtz v. Capital Wall Paper Co.,* D.C.Mun.App., 61 A.2d 470 (1948), *with Bowman v. Redding & Co., Inc., supra,* 145 U.S.App.D.C. at 302, 449 F.2d at 964. This is a question of to whom the employer's duty is owed rather than of the availability of a defense once it is found that the duty is owed.

10. *See, e. g., Princemont Constr. Corp. v. Baltimore & Ohio R. Co.,* D.C.Mun.App., 131 A.2d 877 (1957) (contractual exoneration for negligence valid where railroad not acting as common carrier); *Quimby v. Boston & M.R. Co.,* 150 Mass. 365, 23 N.E. 205 (1890) (contractual consent valid as to nonpaying passenger, but only as to ordinary negligence).

11. *See, e. g., Murphy v. Steeplechase Amusement Co.,* 250 N.Y. 479, 481, 166 N.E. 173, 174 (1929) (taking ride in amusement park in which "[a] fall was foreseen as one of the risks of the adventure").

12. *Cf. Cincinnati Baseball Club v. Eno,* 112 Ohio St. 175, 147 N.E. 86 (1915) (several baseballs in air at one time); *Lee v. National League Baseball Club of Milwaukee,* 4 Wis.2d 168, 89 N.W.2d 811 (1958) (negligent supervision of spectators in scramble for foul ball).

13. *Cf. Willis v. Stewart, supra* at 817–18 (requirement of "an appreciation and an understanding of the dangers that lurk in the defect").

at 440. It thus becomes critical that the plaintiff's consent to what would otherwise be the defendant's negligence be given freely and without any element of coercion attributable to the defendant, for "the risk is not assumed where the conduct of the defendant has left [the plaintiff] with no reasonable alternative." Prosser, *supra* at 451; *see Mosheuvel v. District of Columbia*, 191 U.S. 247, 24 S.Ct. 57, 48 L.Ed. 170 (1903); *Dougherty v. Chas. H. Thompkins Co., supra.* The reasonableness of that choice does not depend upon the availability of an alternative that would require the plaintiff to forego a legal right, *see Dougherty v. Chas. H. Thompkins Co., supra*, 99 U.S.App.D.C. at 350, 240 F.2d at 36 (plaintiff not required to "use another street [or] stay at home" as alternative to use of obviously unsafe sidewalk), unless the assertion of that right is unreasonable in light of the risk involved. *See, e. g., Berg v. Great Northern Ry. Co.*, 70 Minn. 272, 73 N.W. 648 (1897) (fighting prairie fire in effort to save haystack justified finding by trier of fact of contributory negligence).

Whether a wage earner's determination to encounter a known and appreciated risk is voluntary must depend not only upon the particular circumstances in which the determination was made but also upon the policies underlying the statutory safety scheme. Our deference to these policies must produce two limitations upon the validity of a wage earner's consent to relieve an employer of the duty to assure reasonably safe working conditions.

 The first limitation respects the voluntariness of the wage earner's alleged assumption of risk. In general, a determination to encounter a risk is voluntary only if the plaintiffs' choice is unreasonable in light of the alternatives left available by the defendant's conduct. *Mosheuvel v. District of Columbia, supra; Dougherty v. Chas. H. Thompkins Co., supra.* "In this area [of plaintiff's voluntariness] it is reasonably clear that assumption of risk and contributory negligence always coincide, and that it is relatively unimportant which the defense is called." PROSSER, *supra* at

453. Because we have held that a wage earner's claim under the statutory safety scheme is not barred unless he incurred the injury in willful, wanton, or reckless disregard for his safety, his determination to encounter a situation of risk cannot be said to be voluntary unless his determination was, in light of available alternatives, willful, wanton, or reckless.

 The second limitation affects the public interest in the avoidance of accidents. By enactment of the instant statutory safety scheme, Congress imposed an affirmative duty upon persons with control over places of employment or employees to provide reasonably safe working conditions. D.C.Code 1973, § 36–438(a). Even were this duty no greater than the employer's duty at common law, the duty imposed is no longer a private one, wholly subject to waiver by a private party. Congress' concern with industrial accidents, as embodied in this legislation, affects not only the interests of individual wage earners but also the interests of society "in the conservation of the lives and of the healthful vigor of its citizens. . . . " *Johnston v. Fargo*, 184 N.Y. 379, 385, 77 N.E. 388, 390 (1906). Congress has established but one means of waiving the public aspects of an employer's duties under this subchapter: the Minimum Wage and Industrial Safety Board may permit variance from a rule or regulation only if, "notwithstanding such variance, . . . the protection afforded by such rule or regulation will be [otherwise] provided." D.C. Code 1973, § 36–436. If that Board, a public body, is so restricted in its power to waive regulations, it would be wholly incongruous to deem a private individual capable of waiving, *in toto*, the public aspects of an employer's duty toward him. To the extent, therefore, that private waiver of the duty of employers "would tend to encourage on their part laxity of conduct in, if not an indifference to, the maintenance of proper and reasonable safeguards to human life and limb" (*Johnston v. Fargo, supra* at 385, 77 N.E. at 390), the private waiver cannot be given effect. *See, e. g., Hartman v. Lubar*, 77 U.S.App.D.C. 95, 133 F.2d 44

(1942), *cert. denied*, 319 U.S. 767, 63 S.Ct. 1329, 87 L.Ed. 1716 (1943) (borrower does not waive protection of Loan Shark Act by borrowing money from unlicensed person); *Munter v. Lankford*, 127 F.Supp. 630 (D.D. C.1955), *aff'd on other grounds*, 98 U.S.App. D.C. 116, 232 F.2d 373 (1956) (statute of limitations has public as well as private benefits so that waiver may be void as against public policy). *See also McCarthy v. National Ass'n for Stock Car Auto Racing*, 90 N.J.Super. 574, 218 A.2d 871 (1966) (safety regulations affecting public interest may not be waived).

In sum, these two limitations combine to require that an alternative, available to the wage earner, to encountering the risk be one which would not tend to lessen the diligence of employers in their pursuit of the legislative objectives. For example, the wage earner always has, at least in theory, the alternative of foregoing an employment opportunity in order to avoid an unreasonable risk of injury. But were employers permitted to impose upon wage earners such a "take it or leave it" choice, and were we myopically to view the availability of this alternative as an indication of voluntariness, then there would be little incentive for employers to conform to the command of Congress that conditions of employment be made safe. Thus, in *Johnston v. Fargo, supra*, the court held invalid a condition in an employee's contract which purported to exonerate the employer from liability for all negligence. The court said in part:

> The employer and the employed, in theory, deal upon equal terms; but practically that is not always the case. The artisan, or workman, may be driven by need; or he may be ignorant, or of improvident character. It is, therefore, for the interest of the community that there should be no encouragement for any relaxation on the employer's part in his duty of reasonable care for the safety of his employe. [*Id.* 184 N.Y. at 385, 77 N.E. at 390.]

Although once prevalent, the view that an employee impliedly assumed the risks of his employment merely by entering into that employment, belongs to another age. *See, e. g., Dougherty v. West Superior Iron & Steel Co.*, 88 Wis. 343, 60 N.W. 274 (1894) (threat of discharge does not negate implied consent). Current thinking follows the reasoning of *Johnston v. Fargo, supra*, placing the responsibility to minimize risks upon the employer especially where the employee's consent to assume the risks of working is merely implied. This view is noted in *Caspar v. Lewin, supra*, 82 Kan. at 632, 109 P. at 667:

> The liberty of capital to conduct its own business in its own way does not include the right to inflict the cruelties which have invariably characterized industrial progress. The liberty of the wage earner to contract for extra pay for extra hazard and to seek some other employment if he does not like his master's methods is a myth, or, as has been said, "a heartless mockery." *Kilpatrick v. Grand Trunk R.R. Co.*, 74 Vt. 288, 52 Atl. 531, 93 Am. St.Rep. 887.

Such decisions recognize that employment, unlike entertainment at an amusement park, is not a situation in which "[t]he timorous may stay at home." *Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479, 483, 166 N.E. 173, 174 (1929).

Even where the risk becomes apparent only during the course of employment, similar pressures to encounter the risk may exist. Although an express threat of discharge for failure to encounter a risk posed by an employer's breach of the duty to provide safe working conditions might now be rare, the fear of incurring the employer's displeasure by failing to encounter a job-related hazard may not be unfounded. *See, e. g., Marshall v. P & Z Company, Inc.*, 106 Wash.D.L.Rep. 1021 (June 6, 1978) (pretext firing of employee who complained of safety violation). Indeed, the wage earner's own sense of loyalty to his employer may encourage a disregard for his own safety in order that he might more effectively go about his employer's business. To hold that the theoretical availability of the alternative of declining to continue in the normal activities of a wage earner's employment might relieve the employer of the duty to assure safe working conditions would be to

place upon each wage earner the responsibility of weighing the risks of employment hazards against the benefits that might be derived from encountering those risks. The imposition of such a burden hardly serves to encourage an employer's conformance to the congressionally mandated duty of care. To the contrary, it would encourage employers to hire and retain only those wage earners who demonstrated a willingness to encounter the risks which Congress has determined must be eliminated. Such a result cannot be countenanced.

We perceive no bar, however, to proof of the availability of an alternative to encountering a risk where the wage earner's choice would not be influenced by any work-related concern. Thus, for example, a machine may lack a safety device in breach of a safety regulation. The employer might, however, specifically direct a wage earner not to use the unsafe machine. Arguably in such a situation, the wage earner no longer bears the burden of determining whether the risk of injury might be outweighed by other work-related factors, and there would be no bar to a finding that the wage earner voluntarily assumed the risk of injury by using the forbidden machine in willful, wanton, and reckless disregard for his own safety. Or the employer might show that, even though not forbidding the use of the known defective machine, there was fully available for the wage earner's use another machine, known to be safe. In this situation the wage earner might be found to have assumed the risk of injury if his determination to use the defective machine was, in light of the available alternative, made with willful, wanton, or reckless disregard for his safety.

The alternative shown to have been available must however, be an alternative which satisfies the employer's duty of care. Thus, where the employer's duty arises under the general language of the statute, the alternative must be reasonably safe—not merely by comparison to the risk to which it is an alternative, but in itself. Where the duty arises under a rule or regulation more specifically defining the general duty of care, the alternative must provide "[at least] the protection afforded by such rule or regulation . . . ." D.C.Code 1973, § 36–436. Proof of the availability of such alternatives conflicts neither with the requirement that the determination to encounter a risk be fully voluntary nor with the legislatively imposed duty to provide reasonably safe working conditions.

■■■ We hold, therefore, that the defense of assumption of risk is available to bar a claim based upon breach of a duty imposed by the statutory safety scheme only where the defendant bears the burden of proving (1) that there was available to the wage earner [14] an alternative to encountering the risk; (2) that the wage earner's choice between the risk and such alternative was fully voluntary; (3) that such alternative afforded the wage earner safety mandated by statute, rule, or regulation; and (4) that the wage earner's determination to encounter the risk was, under the circumstances, made with willful, wanton, or reckless disregard for his own safety.

### III

We turn now to the evidence in this record.

With respect to appellant's conduct in the manner of encountering the risk posed by the absence of wooden treads, the only evidence is appellant's testimony that, in descending the staircase, "I was being as careful as I could." While the jury was free to discredit this testimony, the trial court was not, for there was no evidence which conclusively rebutted this evidence of due care, much less proving that appellant's manner of descending the stairs was so negligent as to have been reckless.

■■■ Appellant also testified that in determining to encounter the risk posed by the absence of wooden treads, he was not only aware of the defect but appreciated the risk created by the defect. *Cf. Willis v.*

14. *See* note 9, *supra*.

*Stewart, supra.* In the face of his awareness and appreciation, he determined to encounter the risk. Appellant would be barred from recovery, however, only if there was available an adequate alternative to use of the stairway and if his failure to use that alternative was reckless. There was evidence that appellant had two other means of descent from the level upon which he had been working—a ladder which appellant had used to ascend to the plywood level, and various steel columns which ironworkers often used to descend from one level to another.[15] The only evidence relating to the safety of the alternative routes was appellant's testimony that he had used the ladder to ascend and that he had, at other times, ascended and descended by means of bare steel columns. While the jury might have inferred that these means of descent were relatively safe, we cannot say that the jury was compelled to believe that they were as safe as would have been the properly treaded stairs that were required by regulation. Even were the jury so to believe, we could not say that appellant's choice of the untreaded stairs in lieu of either of these alternatives was, as a matter of law, so reckless as to bar his recovery. Both questions presented, at most, issues of fact for the jury; neither was answerable as a matter of law. *Mosheuval v. District of Columbia, supra; Willis v. Stewart, supra; Harris v. Plummer, supra; Dougherty v. Chas. H. Thompkins Co., supra.*

For the foregoing reasons, the judgment is reversed and this case is remanded for a new trial.

*So ordered.*

---

15. Remaining on an upper level of a building under construction until the wooden treads were emplaced could not be deemed an alternative since appellant had an arguably job-related purpose ("I was going down to the crane") for descending, even were descent from that level not within the rule of *Dougherty v. Chas. H. Thompkins Co., supra* (plaintiff not required to forego legal right).