Jirina LaVINE, Plaintiff-Appellant,

v.

CLEAR CREEK SKIING CORPORATION, d/b/a Loveland Basin Ski Area, and Donald Groenke, Defendants-Appellees.

No. 76–1384.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 19, 1977.

Decided June 22, 1977.

Rehearing Denied July 11, 1977.

Charles Q. Socha of Tilly & Graves, Denver, Colo., for plaintiff-appellant.

Richard C. McLean of Sheldon, Bayer, McLean & Glasman, P. C., Denver, Colo., for defendants-appellees.

Before LEWIS, Chief Judge, and BREIT-ENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a diversity action in which the plaintiff-appellant sought to recover damages from an injury which she suffered while skiing. The jury determined that neither the individual defendant, Donald Groenke, who collided with her, nor his employer, Loveland Basin Ski Area, was negligent.

Plaintiff-appellant seeks a reversal of the judgment. She relies first on alleged trial errors rejecting evidence of safety guides and regulations. Exhibits 7, 8 and 9 are evidence of the existence of customs and guides recognized in the skiing community. Those customs and guides require the uphill skier to yield the right-of-way to those who are skiing below.

She also claims that she is entitled to judgment as a matter of law; that the court erred in failing to direct a verdict on the liability issue in her favor.

It is alleged, in addition, that since the individual defendant was a ski instructor with expert knowledge, it was incumbent upon him to exercise the care commensurate with his knowledge as a ski instructor in his relationship to other persons using the ski slopes.

Instructions tendered by appellant pertained to the duties of the uphill skier to a skier below him, who is being overtaken. The refusal of the court to instruct on the "rules of the road" is also assigned as error.

On April 6, 1974, the plaintiff was injured while skiing at the Loveland Basin Ski Area in Colorado. She was shown to have been an expert skier. She had engaged in the sport for a number of years in both Europe and the United States. At the time she was skiing on Nix Nox, a slope which is graded "more difficult." Just prior to the collision which caused the injury, she was engaged in a so-called traverse which is a method of descending on a slope. One traverses for the purpose of maintaining better control and does so by moving at a downhill angle from one side of the slope to the other. This is a moderate method of skiing as compared with skiing straight down the slope.

Plaintiff-appellant testified that she had skied this particular slope on a number of prior occasions. Just before this incident she had first traversed from the left side of the slope to the right side. She then pivoted and looked to see if there was anybody coming. Seeing no one, she then began the traverse to the left. Her turn was approximately 80 degrees. The angle of her movement across the slope was described as being approximately four o'clock. Although she was looking straight ahead, she had some view of the up slope out of the corner of her eye, but saw nothing. Her first awareness that a collision was going to occur was just prior to the happening. The defendant-appellee was three, four or five feet away and was headed toward her. According to her testimony, he grabbed her as they collided. It was then that she heard a crack of her left knee. The kneecap shattered. She was conveyed to Idaho Springs, and after examination there was transported to a hospital in Denver where an internal reduction operation was performed.

The individual defendant-appellee, Donald Groenke, was a part-time ski instructor at Loveland Basin. He had 20 years of skiing experience and had served on the National Ski Patrol in the Midwest. He had had his own ski school there and had been at Loveland Basin from 1971 until 1974. His version was that he was skiing the fall line or proceeding in a straight line down the hill. He was in the middle of the slope when he first noticed appellant. He described his movement as short swing, that is he was making a series of short turns turning to the right and the left as he skied downhill. When he first saw appellant, she was on the right side of the slope and was down slope from him. She was crossing it in a diagonal angle or traverse. He said that he was in control as he skied down the hill, that is proceeding at a safe speed and able to make turns and also able to stop if necessary. He said that the plaintiff was traversing at a very slow angle and that he sought to ski behind her, but that prior to impact she stopped and that he ended up colliding with her.

Groenke admitted on cross-examination that he had not changed his direction or slowed down or yelled at the plaintiff to avoid the collision. He also acknowledged that he could have done these things to avoid the collision and did not do them because she was traveling at a slow angle; that his custom was to try and ski behind a traversing student, and because she stopped "we ended up meeting." [1]

1. His actual testimony is surprising. It reads:
Q  Is there any reason why you didn't stop or change your direction or slow down or yell at Mrs. LaVine to avoid that collision?
A  No.
Q  Could you have done those things to avoid the collision?
A  Yes.
Q  Can you tell us why you did not do it?
A  The plaintiff was traversing at a very slow angle. Subconsciously as I ski down any slope, I definitely have the skier in view. I always try and ski behind a traversing stu-

## I.

WHETHER IT WAS ERROR FOR THE TRIAL COURT TO DENY ADMISSION IN EVIDENCE OF EXHIBITS 7, 8 AND 9, AND WHETHER THE COURT ALSO ERRED IN REFUSING TO INSTRUCT THE JURY SPECIFICALLY THAT A SKIER WHO IS BELOW ANOTHER SKIER HAS THE RIGHT–OF–WAY

■ Exhibit 7 is a pamphlet which is given out by the National Ski Patrol. It has a number of suggestions for safe skiing and also contains in it an admonition "to always give the moving skier below you the right-of-way."

Exhibit 8 is the National Skier's Courtesy Code which is published by the U.S. Ski Association. Among the suggestions in this code is one which states that "when skiing downhill and overtaking another skier, the overtaking skier shall avoid the skier below him." Another provision states that "skiers shall not stop in a location which will obstruct a trail."

To the same effect is Exhibit 9 which is the ski instructor's handbook. It has two provisions in it which pertain to overtaking another skier. The court permitted testimony about the exhibits, which was put into the record, to be admitted, but rejected the exhibits themselves. One witness, Otto Werlin, General Manager of Loveland, testified that these rules were followed by the Loveland Ski Area.

It is conceded by counsel for appellant that violations of these rules do not result in the violator being negligent per se. At most, then, these are guidelines or evidence of negligence.

It is understandable that the trial court was hesitant to accept these documents in evidence and thus to emphasize them, whereby the jury could believe that the uphill skier's duty to avoid colliding with the downhill skier was absolute.

Cases relied upon by appellant do support the principle that a regulation setting forth a standard is considered to be proper evidence. *See Denning Warehouse Co. v. Widener*, 172 F.2d 910, 913 (10th Cir. 1949); *Brigham Young University v. Lillywhite*, 118 F.2d 836 (10th Cir. 1941). *See also Blohm v. Cardwell Mfg. Co.*, 380 F.2d 341 (10th Cir. 1967). Furthermore, Prosser states that evidence of customary conduct is normally relevant and admissible. Law of Torts 166 (1971). *See* Restatement Torts (Second) § 295A, Comment b.

Counsel for appellant concedes that the record contains references to the so-called rule of the slope. This took place in connection with the tender of Exhibits 7, 8 and 9. It is said, however, that the final instruction of the court told the jury that they could consider only evidence offered at trial and received by the court. While this did not rule out the oral testimony regarding the uphill-downhill skier relationship, it had the effect of substantially de-emphasizing it. The result, so the argument goes, is that the governing custom requiring the uphill skier to yield the right-of-way to the downhill skier was virtually excluded from the case. Also, the refusal of the court to instruct on this subject further played down the duty of the uphill skier toward the downhill skier.

Our court in construing Colorado law has in dicta recognized the applicability of this right-of-way principle in the case of *Ninio v. Hight*, 385 F.2d 350 (10th Cir. 1967). *Ninio* was a case in which the downhill skier, a beginner, was waiting to commence a traverse. The defendant crashed into her and others who were members of a ski class. The difference is that plaintiff in this case had moved to the center of the slope. The opinion states that while skiing, the plaintiff, Ms. Ninio, invoked the unwritten "rule of the road" applicable to skiing activities under which an overtaking skier "is required to yield to skiers below him who are being overtaken." The court rec-

---

dent, and prior to impact, because the skier had stopped, the plaintiff had stopped, it

just—we ended up meeting, causing an accident.

ognized that an experienced skier has some obligation because of his experience, as follows:

> She points to the admitted fact that as an experienced skier, Hight was fully cognizant of this well-known rule and was the overtaking skier when he collided with the members of the ski class.

385 F.2d at 351. The court further observed that defendant was in control and was able to see the people with whom he collided.

As in the instant case, the uphill skier in *Ninio* offered an excuse. He there said that he caught an edge. In our case he said that plaintiff stopped in the middle of the slope.

Although the trial court might well have received the documentary evidence as to the uphill-downhill relationship (and even though this writer would have preferred such action), since oral testimony concerning it was received, we do not regard the court's action as prejudicial error. Under more aggravated circumstances we might take a different view as to the rejection of the guides being prejudicial.

## II.

WHETHER THE COURT WAS IN ERROR IN REFUSING TO INSTRUCT THE JURY THAT THE INDIVIDUAL DEFENDANT, MR. GROENKE, WAS SUBJECT TO A STANDARD OF CARE HIGHER THAN THAT OF OTHERS BASED UPON HIS SPECIAL KNOWLEDGE, TRAINING AND SKILL AS A CERTIFIED SKI INSTRUCTOR

In support of her argument, appellant cites the fact that Groenke had been skiing for 20 years, had served as a ski patrolman, had taught at other ski areas and had had his own ski school in the Midwest. He was also a certified ski instructor accustomed to teaching safe skiing to his students. The instruction that was tendered by appellant defined negligence as failure to act in accordance with a prudent person's standard. It then went on to say:

> In addition to the care which a reasonably prudent person would have exercised, defendant Groenke, by reason of his special training, knowledge and experience as a ski instructor, was required by law to exercise that degree of care to avoid injury to the plaintiff which a reasonably prudent ski instructor with his degree of skill, experience, and training would have exercised under the same or similar circumstances.

This is a projection of the standard of the reasonable man. It provides in substance that if the actor has more than the minimum qualities he must emphasize these qualities in a manner reasonable under the circumstances. The trial court rejected this paraphrase of the Restatement of Torts (Second) § 289, Comment m.

It would appear then that in order to satisfy the standard of care, a person having special knowledge must exercise a quantum of care which is commensurate with the circumstances, one of which is his or her special skill and training. An instruction of this kind is not easy to expound in a charge to a jury for the reason that it is capable of creating the impression that a double standard of care exists. In truth there is but one standard, that of reasonable prudence under the circumstances. The decision must be made on the basis of the surrounding circumstances, including the fact that the person involved is an expert. He is called upon to exercise care commensurate with his knowledge of the risk in order to satisfy this "reasonable" standard.

The stock instruction on negligence, Devitt and Blackmar, Federal Jury Practice and Instructions (2d ed.), Vol. 2, § 73.03, p. 156, states that

> Negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, when prompted by considerations which ordinarily regulate the conduct of human affairs. It is, in other words, the failure to use ordinary care under the circumstances in the management of one's per-

son or property, or of agencies under one's control.

The definitions which the court gave were substantially in accordance with the Devitt and Blackmar instruction. The definitions covered both negligence and contributory negligence and also defined reasonable care. The instruction was a proper statement of the general definition of contributory negligence. Noticeable by its absence, however, was an instruction to the effect that the defendant's expertise was to be considered in assessing the quantum of care required to satisfy the reasonable standard. Here again, the court's omission of such an instruction was not prejudicial.

### III.

WHETHER IT WAS ERROR FOR THE COURT TO REFUSE TO DIRECT A VERDICT IN FAVOR OF PLAINTIFF ON LIABILITY OR TO GRANT A MOTION FOR JUDGMENT NOV

Appellant contends that the collision itself conclusively establishes the defendant's negligence and the plaintiff's right to recover. We disagree. True, there was evidence that the defendant was skiing under control. According to his testimony, plaintiff stopped in the middle of a traverse making it impossible for him to pass behind her as he had planned. The jury found that the defendant was free of negligence and that the plaintiff was free of contributory negligence.

It is true that the jury in a ski slope case tends to view the entire skiing scene as one involving a high degree of hazard in which the skier assumes a degree of risk by merely taking to the slopes. This is an attitude which tends to be pervasive in injuries which involve participation in sports. Assuming this is the attitude, it is inappropriate for us to reach out, so to speak, in an effort to change the result. The jury has considered the case and the court has not acted so as to prejudice the appellant. The verdict must stand.

The judgment of the district court is affirmed.