Kavoos SINAI and Maliheh
Sinai, Appellants,

v.

POLINGER COMPANY and Park
Southern Company, Appellees.

No. 82–1139.

District of Columbia Court of Appeals.
Argued April 26, 1984.
Decided Aug. 30, 1985.

Sherman L. Cohn, Washington, D.C., with whom Steven M. Pavsner, Washington, D.C., was on brief, for appellants.

Austin F. Canfield, Jr., Washington, D.C., for appellees. Willard E. Johnson also entered an appearance.

Before NEBEKER, MACK and BELSON, Associate Judges.

MACK, Associate Judge:

This is a negligence action arising out of an attack on Dr. Kavoos Sinai by a co-tenant in an apartment building in which Dr. Sinai leased office space. Sinai and his wife, Maliheh Sinai, appeal from a jury verdict for defendants-appellees Park Southern Co. and Polinger Co., respectively the owner and manager of the building. The Sinais assign as error, first, the trial court's instructions on assumption of risk, contributory negligence and the standard of care required of the defendants, and second, the admission into evidence of certain photographic and testimonial evidence. Finding no error, we affirm.

## I.

Kavoos Sinai, a physician, leased office space at the Park Southern Apartments in the District in 1975. On December 2, 1977, as he was entering the building from its parking lot, he was accosted by a man he did not recognize, who cursed him and slapped him. This man was Willard Johnson, a tenant at the Park Southern. Following this encounter, which lasted approximately three minutes, Johnson proceeded out to the parking lot. Sinai went directly to the apartment's management office and related what had happened to the three employees on duty, and the employees told him that they would call the police. Sinai then went back to the parking lot, according to his testimony in order to obtain some information on his assailant's identity to give to the police when they arrived. From the parking lot entrance he observed Johnson entering a parked car but could not see the car's license plate. He therefore went out into the parking lot, stood in front of Johnson's car, and started to record the license number. Johnson thereupon exited the car with a gun, and fired one shot, which missed Sinai. Sinai reacted by grabbing Johnson and pushing him to the ground, holding him there for approximately five minutes. He testified that he could not control the hand in which Johnson held the gun, however, and he therefore released Johnson and attempted to escape. Johnson immediately fired the gun twice, hitting Sinai, who fell to the ground. Johnson then approached Sinai and fired three additional shots, striking him as he lay on the ground. Sinai suffered severe permanent injuries from this attack.

Sinai and his wife filed this action against Johnson, Polinger Co., and Park Southern Apartments. A default judgment was entered against Johnson, and the jury assessed damages against him in the amount of $1.5 million. Johnson is not a party to this appeal.

The Sinais' theory of liability as to Park Southern and the Polinger Co. was that these defendants were aware that Johnson posed a risk of harm to other tenants in the building, yet had failed either to evict him or to warn other tenants of the danger. The Sinais presented evidence that Johnson

repeatedly complained to the apartment management that unidentified tenants were watching him, harassing him, leaving packages in the hall and in the parking lot in an attempt to "trap" him into stealing them, and that other tenants had tried to run him over in the parking lot. In addition, the management was aware that on one occasion Johnson had fired several shots from his balcony into the parking lot, and that on a second occasion he had threatened another tenant with a gun. Following the latter event, the police were called, and Johnson admitted having a gun. The resident manager of the Park Southern also questioned Johnson about the gun, and in addition warned the complaining tenant that Johnson was "off" and that the tenant should avoid getting into a hostile situation with him.

The defendants contended that Johnson's attack on Sinai was not foreseeable, and that in any event Sinai was contributorily negligent and/or assumed the risk by following Johnson to the parking lot instead of waiting for the police, by taking the license number down from an unprotected position in front of Johnson's car, by attempting to disarm Johnson following the first shot rather than escaping, and by failing to hold Johnson until help arrived. The jury was instructed on contributory negligence and on assumption of risk, and returned a general verdict in favor of the defendants.[1]

## II.

### A. Assumption of Risk

The Sinais contend that there was no evidence upon which the jury could have based a finding that Dr. Sinai "assumed the risk" of injury in his encounter with Willard Johnson, and we agree. Nevertheless, on this record—where the propriety of giving a contributory negligence instruction is not challenged, where the defenses of assumption of risk and contributory negligence substantially overlap, and where the assumption of risk instruction actually given was little more than a second instruction on contributory negligence [2]—we can find no reversible error.

1. Because the jury returned a general verdict, we do not know whether it even reached the question of contributory negligence or assumption of risk: the jury may simply have found no negligence on the part of the defendants. We do not rule out the possibility, in future cases, of requiring that a plaintiff make some showing of special prejudice before he will be permitted to challenge the verdict based on issues the jury may well never have reached, where the plaintiff, as in this case, failed to request that special interrogatories be submitted to the jury. No court has yet fashioned such a requirement, however; in fact, the case law is to the contrary. See Lewis v. Met. Area Transit Auth., 463 A.2d 666, 673 (D.C.1983) (Where jury returned general verdict, court held that it could not find the trial judge's failure to instruct on key issue in case was harmless. "We cannot know whether the jury's general verdict ... rested upon a finding of no negligence, or a finding that [defendant's defense] was valid against [plaintiff-] appellants," and therefore reversal was warranted.); Eichmann v. Dennis, 347 F.2d 978, 982 (3d Cir.1965) (Where jury returned general verdict in wrongful death case following receipt of erroneous instructions on defendant-appellee's defenses, the court refused to credit defendant's argument that because the jury may have found no negligence by the defendant, the instruction-

al errors were harmless. Reversal was warranted because "[t]he jury returned a general verdict from which the basis of their decision is not ascertainable."). See also E.L. Cheeney Co. v. Gates, 346 F.2d 197, 200 (5th Cir.1965) (since "everything was wrapped in the enigma of a general verdict, [ ] all must go back for another round.... [T]he mystery, being impenetrable, compels a reversal.") We therefore decline to impose such a new rule retroactively upon appellants in this case, and we accordingly reach the merits of the claimed errors in the trial court's instructions.

2. The contributory negligence instruction was as follows:

Contributory negligence is negligence on the part of a person which combining in some degree with the negligence of another helps in proximately causing the injury of which that person claims.... [I]n determining whether Dr. Sinai was contributorily negligent you make factual decisions on what he did and apply the standard that I spoke of earlier, that is, did Dr. Sinai fail to exercise ordinary care in the circumstances. Did he do or fail to do something which a person using ordinary care would do or not do. Remember that ordinary care means that care, caution and

The defenses of contributory negligence and assumption of risk may be viewed as "intersecting circles, with a considerable area in common." W. PROSSER & W. KEETON, LAW OF TORTS § 68, at 481 (5th ed. 1984). In evaluating the propriety of a contributory negligence instruction, the trial court must focus upon the objective reasonableness of the plaintiff's conduct, and must determine whether the defendant has presented evidence that the plaintiff's behavior in encountering the risk departed from the standard of care that is to be expected of the reasonable person in the plaintiff's position. The plaintiff's departure from the normal standard of conduct (his "fault") deprives him of the right to assert that the defendant was also at fault. A contributory negligence instruction is appropriate only if the defense has borne its burden to put forth some evidence upon which a jury could find that the plaintiff, by encountering the risk created by the defendant's breach of duty, departed from an objective standard of reasonable care. As noted, the Sinais do not question the propriety of a contributory negligence instruction based on the evidence put forth by the defendants.

Assumption of risk as a bar to recovery stands on a different theoretical footing, however. The plaintiff is not barred from recovering damages because of his "fault." Rather, the plaintiff must subjectively know of the existence of the risk and appreciate its unreasonable character. RESTATEMENT (SECOND) OF TORTS § 496D (1965).[3] Because he elects to proceed in the face of a known danger, the plaintiff is regarded as having consciously relieved the defendant of any duty which he otherwise owed the plaintiff. Being under no duty, the defendant may not be charged with negligence. Thus assumption of risk, strictly speaking, bars an action under a theory of "waiver" or "consent," rather than fault.

Appellees argued in the trial court that Sinai assumed the risk of his injuries by following Johnson out of the parking lot, by tackling Johnson once the first shot was fired, and then by failing to subdue him before attempting to flee. We agree with appellants that under the hornbook definition of assumption of risk, by none of these actions could Sinai in any sense be said to have "assumed the risk" of being shot five times by Johnson. Although Sinai did assume the risk of an altercation, and perhaps of a fistfight between the two men, the gun that Johnson pulled out of his car introduced a "new element" into the situation, see W. PROSSER & W. KEETON, supra § 68, at 489. Sinai had no knowledge that Johnson was armed, and therefore cannot be said to have assumed the risk of a gunfight. This new element escalated the conflict, transforming it from one

---

attention which a reasonable person would exercise under similar circumstances. Bear in mind that the similar circumstances are those which confronted the doctor on December 2nd. If you find that he was confronted with an emergency situation, he is not held to the same conduct as one who had an opportunity to reflect on his situation. Even though it later appears that he may have made the wrong decision you determine his conduct on the basis of what a reasonable person would do under similar conditions including, if you find it, emergency conditions. If Dr. Sinai was contributorily negligent in a manner which proximately caused his injuries, neither he nor Mrs. Sinai can recover. . . .

The assumption of risk instruction was given immediately thereafter, as follows:

[A]ssumption of risk occurs where the evidence shows that the plaintiff, Dr. Sinai, knew or should have known the existence of a dangerous situation and second, that he voluntarily exposed himself to that danger. . . . [I]f a person assumes the risk in a manner which proximately causes his or her own injuries, that person may not recover.

3. Section 496D provides:
Knowledge and Appreciation of Risk
Except where he expressly so agrees, a plaintiff does not assume the risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character.
See also id. § 496D comment c (subjective standard of conduct in defense of assumption of risk versus objective standard of contributory negligence).

whose risks were more or less known into one whose potentialities Sinai could in no way have anticipated.[4]

Appellees further contend that once Sinai had knowledge that Johnson was armed—*i.e.*, after the first shot was fired—he "assumed the risk" of harm by charging Johnson and failing to render him unconscious before fleeing. A plaintiff may not be said to have assumed a risk, however, where

> the defendant's tortious conduct has forced upon him a choice of courses of conduct, which leaves him no reasonable alternative to taking his chances. A defendant who, by his own wrong, has compelled the plaintiff to choose between two evils cannot be permitted to say that the plaintiff is barred from recovery because he has made the choice.

RESTATEMENT, *supra* § 496E comment c (cited with approval in *Kanelos v. Kettler*, 132 U.S.App.D.C. 133, 137, 406 F.2d 951, 955 (1968)); *see Martin v. George Hyman Construction Co.*, 395 A.2d 63, 72 (D.C. 1978) (" 'the risk is not assumed where the conduct of the defendant has left [the plaintiff] with no reasonable alternative' "

[citation omitted] ); *Dougherty v. Chas. H. Tompkins Co.*, 99 U.S.App.D.C. 348, 350, 240 F.2d 34, 36 (1957).

Thus, none of Sinai's actions fall within the traditional definition of assumption of risk. Nevertheless, in cases in which the defendant may assert that the plaintiff's actions were negligent—in other words, that he was unreasonable in encountering a known risk or a risk of which he should have been aware[5]—the defenses of contributory negligence and assumption of risk are often used interchangeably. Where the plaintiff is charged with having contributed to his injury by unreasonably encountering a risk,[6] as the authors of the Restatement have observed, "[o]rdinarily it makes no difference which the defense is called." RESTATEMENT, *supra* § 496A comment d. According to the Restatement, "[t]he great majority of the cases involving assumption of risk have been of this type, where the defense overlaps that of contributory negligence. The same kind of conduct frequently is given either name, or both." *Id.*[7] *See also Pritchard v. Liggett & Myers Tobacco Co.*, 350 F.2d 479, 484 (3d

---

4. *See* W. PROSSER & W. KEETON, *supra* § 68, at 485 ("It is not true that in any case where the plaintiff voluntarily encounters a known danger he necessarily consents to any future negligence of the defendant.").

5. The commentators refer to this type of assumption of risk as "secondary," *see* James, *Assumption of Risk*, 61 YALE L.J. 141 (1952). Assumption of risk in its "primary" sense refers to risks that are incidental to a relationship of free association between plaintiff and defendant, *i.e.*, where neither party has a duty of care towards the other to make the conditions of the relationship reasonably safe. *See Morrison v. MacNamara*, 407 A.2d 555, 566 (D.C.1979). Also within this category are cases in which the plaintiff has expressly consented in advance to take his chances of injury from a known risk. W. PROSSER & W. KEETON, *supra* § 68, at 480. "The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence." *Id.* at 481. According to Professor James, assumption of risk in the primary sense in fact "does not, analytically, describe a defense at all. It is simply a lefthanded way of describing a lack of duty." James, *supra*, 61 YALE L.J. at 168.

6. On appeal, the Sinais do not contend that the evidence did not support a contributory negligence instruction, and thus concede that the defendants presented sufficient evidence upon which the jury could find that the plaintiff acted unreasonably in encountering a risk created by the defendants' negligence.

7. Significantly, the drafters of the widely used model federal court jury instructions have recognized that the assumption of risk defense is in most negligence cases subsumed within the rubric of contributory negligence, providing for an assumption of risk instruction only in strict liability cases. 3 E. DEVITT & C. BLACKMAR, FEDERAL JURY PRACTICE & INSTRUCTIONS § 82.09. It is in cases of reckless conduct by the defendant and in strict liability cases that the defense of assumption of risk in its strict sense takes on importance, for in these cases the plaintiff's contributory negligence will not bar his action, while assumption of risk will be a valid defense. *See Payne v. Soft Sheen Prods., Inc.*, 486 A.2d 712, 721–22 n. 9 (D.C.1985) and authority cited therein.

Cir.1965) (assumption of risk in this sense "is ordinarily synonymous with contributory negligence and involves a failure to exercise reasonable care for one's own safety. Under this concept recovery is barred because of the plaintiff's departure from the standard of reasonable conduct and notwithstanding the misconduct of the defendant"), *cert. denied,* 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475 (1966); *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 423 (Tex.1984) ("Assumed risk ... [is] nothing more than [an] extreme variant[ ] of contributory negligence. To varying degrees, [both] ... focus on the reasonableness of a plaintiff's conduct."); *National Marine Services, Inc. v. Petroleum Services Corp.,* 736 F.2d 272, 276–77 (5th Cir. 1984) (in a comparative negligence jurisdiction, court holds that since "[e]xperience has demonstrated ... the niceties of these theoretical distinctions [between assumption of risk and contributory negligence] are often lost in the practical application of these defenses," the court is "persuaded that no distinction should be made between [them], but that the plaintiff's conduct (whether theoretically mere contributory negligence or assumption of the risk) should be analyzed solely under the principles of comparative fault"); James, *supra,* 61 YALE L.J. at 141 (this type of assumption of risk "is a form of contributory negligence").

■ Here, the trial court's instructions on contributory negligence, to which no objection is raised, encompassed some of the very same activities that the defense assigned as evidence that Sinai had assumed the risk. The court instructed the jury that the defendants' six assignments of contributory negligence were as follows:

"the failure to await the arrival of the police, the pursuit of Johnson to his car, failing to take the tag number from a position of safety, failing to render Johnson unconscious or taking his gun away from him, and leaving the scene when Johnson still had the gun." In light of the substantial theoretical overlap between the two defenses recognized by the cases and commentators, we find that on the facts of this case the assumption of risk instruction was most likely harmless error.

■ Moreover, the trial court here gave an "assumption of risk" instruction that was actually a hybrid of contributory negligence and assumption of risk. Based on Superior Court Civil Instruction 5–16 (1981), that instruction was as follows: "[A]ssumption of risk occurs where the evidence shows that the plaintiff, Dr. Sinai, knew *or should have known* the existence of a dangerous situation and ... he voluntarily exposed himself to that danger." (Emphasis added.) This instruction thus held the plaintiff to a reasonable man standard (which is the focus of a contributory negligence defense) rather than to the subjective standard of knowledge of true assumption of risk.[8] While the instruction does inform the jury that the plaintiff must have "voluntarily" assumed the risk, some degree of volition by the plaintiff is also encompassed within the contributory negligence defense.[9] In addition, a jury, faced with an instruction that it find that the plaintiff assumed the risk if he "voluntarily" encountered a risk of which he "should have" been aware, would presumably focus upon the reasonableness of the plaintiff's actions, which of course must also be the jury's focus in evaluating the plaintiff's contributory negligence.[10]

**8.** *See* RESTATEMENT, *supra* § 496D comment b (plaintiff's "failure to exercise due care either to discover or to understand the danger is not properly a matter of assumption of risk, but of the defense of contributory negligence").

**9.** *See Martin, supra,* 395 A.2d at 72 (in area of voluntariness " 'it is reasonably clear that assumption of risk and contributory negligence always coincide, and that it is relatively unim-

portant which the defense is called' " [citation omitted] ).

**10.** The model Superior Court instruction, upon which the trial court's instruction was based, does refer to case law from this jurisdiction to support the instruction's wording. These cases, however, plainly set forth a requirement that a plaintiff have encountered a risk whose magnitude is actually known to him before he can be

In sum, in light of the focus of the assumption of risk instruction here on the reasonableness of the plaintiff's conduct rather than upon his conscious assent to encounter a known risk, it is unlikely that the jury could have interpreted the instruction as anything more than a repetition of the previously given contributory negligence instruction. Thus, even if it could be argued that a true assumption of risk instruction could not have been harmless error,[11] there would be no reversible error in this case because no true assumption of risk instruction was given the jury by the trial court.

### B. Contributory Negligence

The second assignment of error on appeal is that the trial court erred in basing its instruction as to contributory negligence on the 1968 version of the model Superior Court Jury Instructions, because the instruction, as formulated there, is likely to mislead the jury.

■ The trial court instructed the jury that "[c]ontributory negligence is negligence on the part of a person which combining *in some degree* with the negligence of another helps in proximately causing the injury of which that person claims [emphasis added]." Appellants assert, correctly, that the causal relation between an actor's departure from the standard of ordinary care and the resulting injury should be measured using the same yardstick whether the direct negligence of the defendant or the contributory negligence of the plaintiff is at issue. The defendant may not be held liable, and conversely the plaintiff may not be barred from recovery, unless their respective negligence was a "substantial factor" in causing the injury. *See, e.g., Lacy v. District of Columbia,* 424 A.2d 317, 319–21 (D.C.1980) (defendant's negligence); *District of Columbia Transit System v. Harris,* 284 A.2d 277, 279 (D.C.1971) (plaintiff's contributory negligence). Appellants argue that the use of the language "in some degree" led the jury to believe that, while the defendants' negligence had to play a substantial part in causing the injury in order for them to be held liable, the plaintiff would be barred by only "some degree" of his own negligence.

■ It is true that the 1981 edition of the Civil Jury Instructions eliminates the "in some degree" language, providing simply

barred from recovery because he has assumed the risk. *See Dougherty, supra,* 99 U.S.App.D.C. at 349, 240 F.2d at 35 ("The elements which must be shown to give rise to the defense of assumption of risk are ... knowledge of the danger and ... voluntary exposure to that known danger."); *Weber v. Eaton,* 82 U.S.App. D.C. 66, 67–68, 160 F.2d 577, 578–79 (1947) (assumption of risk "involves a mental state of willingness"). This requirement has been confirmed in subsequent cases from this jurisdiction that consider the elements of the defense. *See Scoggins v. Jude,* 419 A.2d 999, 1004 (D.C. 1980); *Morrison, supra,* 407 A.2d at 567; *Harris v. Plummer,* 190 A.2d 98, 100 (D.C.1963). *See also* W. PROSSER & W. KEETON, *supra* § 68, at 487. Certainly in a strict liability case, at the very least, Civil Instruction 5–16 would be an incorrect statement of the law of assumption of risk. For in the strict liability context, 5–16 substantially eases the defendant's burden by in effect allowing a forbidden contributory negligence instruction to be given the jury under the guise of "assumption of risk."

**11.** For example, in *Dougherty v. Chas. H. Tompkins, supra,* the circuit court held that even where a contributory negligence instruction was proper, instructing the jury on assumption of risk was reversible error. 99 U.S.App.D.C. at 350, 240 F.2d at 36. In *Dougherty* the plaintiff had slipped in the snow on a temporary walkway constructed by the defendant. The court held that although the plaintiff's choice of using the temporary sidewalk presented a question of contributory negligence, the plaintiff could not be found to have assumed the risk of injury even though he had seen the snow. Since the defendant was under a statutory duty to maintain the sidewalk properly, he "had no right to force [the plaintiff] into 'taking or leaving' the risk. To so hold would mean the public must use another street, stay at home, or use the temporary sidewalk at peril." *Id.* The plaintiff's choice of using the sidewalk could therefore not be deemed "'voluntary' in the sense contemplated in an assumption of risk situation." *Id.* In this case, in contrast, the question of the voluntariness of Dr. Sinai's conduct in encountering the risk was a question for the jury and bore no necessary relationship to the defendant's duty, if any, to evict Johnson.

that "a plaintiff cannot recover if his negligence is a proximate cause of his injury." The "in some degree" language of the 1968 instruction, however, is also a correct statement of the law in this jurisdiction, for in context this language refers to some degree of *contribution* to the injury rather than to some degree of negligence. The "in some degree" language also has the advantage of making clear to the jury, as the 1981 instruction does not, that it may not weigh the relative contributions of the defendant and the plaintiff to the injury. Because this jurisdiction has not adopted comparative negligence, the plaintiff is barred from recovery if his negligence was a substantial factor in causing his injury, even if the defendant was also negligent, as long as the plaintiff's negligence contributed in "some degree" to his injury. The "in some degree" language so instructs the jury, while the 1981 instruction does not.

▆▆▆ The instruction given by the trial court did state that the plaintiff's negligence must have "proximately cause[d]" the injury in order for the plaintiff to be barred from recovery, and the trial court had defined proximate cause a few sentences before the contributory negligence instruction as an act that "play[s] a substantial part in bringing about the injury or the damage." The court's instruction, in sum, did refer to the correct standard of causation, the "substantial factor" test; and as long as the substance of the instruction is correct "[t]he particular form of [the] instruction [ ] is generally within the trial court's discretion." C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2556, at 655 (1971). Therefore, since "[i]t will be presumed that the jury followed the instructions correctly as they were given," *id.* § 2558, at 668, the instruc-

tion as formulated by the trial court was not error.[12]

## C. *Standard of Care*

Appellants next contend that the trial court erred in its definition of the standard of care required of Polinger and Park Southern in the circumstances of this case. They note that the property manager employed by Polinger to oversee the Park Southern Apartments, Ronald Goodwin, who was responsible for evictions, was qualified as a "Certified Property Manager" (CPM) at the time of Johnson's assault on Sinai. To become a CPM an applicant must have three to five years of experience in property management, must complete several courses, and must pass a peer review. An applicant who has completed these requirements will then be certified by the CPM organization, the Institute of Real Estate Management. CPMs are not licensed by federal or state authorities, however, and there is no requirement in the District of Columbia that property managers be certified as CPMs. Nevertheless, appellants contend that the jury should have been instructed that the defendants must be held to a professional negligence standard: that of a reasonable certified property manager.

In support of an instruction setting forth this standard of care, appellants point to the Second Restatement of Torts, which provides:

> If the actor has in fact more than the minimum of these qualities [attention, perception, memory, knowledge, intelligence and judgment], he is required to exercise the superior qualities that he has in a manner reasonable under the circumstances. The standard becomes, in other words, that of a reasonable man with such superior attributes.[13]

---

**12.** In order to avoid even the possibility of confusion in cases in which the trial court elects to give an instruction using the "in some degree" language of the 1968 instruction, the plaintiff may want to request that the court reinstruct the jury on the meaning of proximate cause

immediately following the contributory negligence instruction.

**13.** Significantly, in the one reported decision to consider whether a trial court's decision to reject a plaintiff's proposed instruction based on this Restatement comment was grounds for re-

RESTATEMENT, *supra* § 289 comment m. In *Morrison v. MacNamara, supra,* this court noted the applicability of this Restatement rule to cases of professional malpractice, and held that in such cases, "the duty of reasonable care requires that those with special training and experience adhere to a standard of conduct commensurate with such attributes. It is this notion of specialized knowledge and skill which animates the law of professional negligence." 407 A.2d at 560.

 Whether or not this case can be subsumed under the rubric of "professional malpractice," the standard of care required of the defendants is in any case unchanged. As we said in *Morrison,* "[t]he law of negligence generally does not acknowledge differing standards or categories of care, but requires an adherence to a uniform standard of conduct: that of reasonable care under the circumstances." *Id.* Even in cases like this one, where the law imposes a special duty upon the landlord to protect his tenant from foreseeable acts of third

parties, *Kline v. 1500 Massachusetts Avenue Apartment Corp.,* 141 U.S.App.D.C. 370, 375, 439 F.2d 477, 482 (1970),[14] "in the last analysis the standard of care is the same—reasonable care in all the circumstances," *id.* 439 F.2d at 485.[15] So, although appellants couch their argument as going to the proper "standard of care" to which the defendants are to be held, it more properly goes to the *amount* of care owed the plaintiff by the defendants. In other words, appellants' argument, properly phrased, is that since the defendants' property manager was a certified CPM at the time of the assault on Sinai, one of the "circumstances" that the jury should have been instructed to take into account in determining the amount of care reasonably owed by the defendants here to Sinai is Goodwin's extra knowledge and training.

We do not reach the question of whether the plaintiffs' evidence established the existence of, and uniform principles adhered to by, a "profession" of CPM-trained prop-

---

versal, *LaVine v. Clear Creek Skiing Corp.,* 557 F.2d 730 (10th Cir.1977), the court found no prejudicial error. In *LaVine,* the plaintiff had been injured on a ski slope when the defendant, a ski instructor, collided with her. The requested instruction, rejected by the trial court, was as follows:

> In addition to the care which a reasonably prudent person would have exercised, defendant [ ], by reason of his special training, knowledge and experience as a ski instructor, was required by law to exercise that degree of care to avoid injury to the plaintiff which a reasonably prudent ski instructor with his degree of skill, experience, and training would have exercised under the same or similar circumstances.

557 F.2d at 734. The trial court instead based its standard of care instruction upon the "stock" federal jury instruction, which defines negligence by reference to the standard of a "reasonably prudent *person* " rather than a reasonably prudent expert. Noting that it is true that "a person having special knowledge must exercise a quantum of care which is commensurate with the circumstances, one of which is his or her special skill and training," the court found that plaintiff's proposed instruction might be confusing to the jury "for the reason that it is capable of creating the impression that a double standard of care exists. In truth there is but one standard, that of reasonable prudence under the

circumstances." *Id.* The court found no prejudicial error, *id.* at 735, presumably because the standard instruction to the jury, holding the defendant to "ordinary care under the circumstances," encompasses within the term "circumstances" the extra knowledge and expertise of the defendant. The standard instruction has the additional advantage, as the court pointed out, of making clear to the jury that there is only one *standard* of care, while leaving to the jury the determination of the proper *amount,* or quantum, of care that should be exercised in the individual "circumstances" of each case.

**14.** *See also Graham v. M & J Corp.,* 424 A.2d 103, 105 (D.C.1980); *Spar v. Obwoya,* 369 A.2d 173, 178–79 n. 5 (D.C.1977).

**15.** "This jurisdiction does not recognize varying standards of care depending upon the relationship of the parties but always requires reasonable care to be exercised under all the circumstances." *Blumenthal v. Cairo Hotel Corp.,* 256 A.2d 400, 402 (D.C.1969). *See also D.C. Transit Sys., Inc. v. Carney,* 254 A.2d 402, 403 (D.C.1969) ("there are no categories of care, i.e., the care required is always reasonable care"); W. PROSSER & W. KEETON, *supra* § 34, at 209 ("What is required [even in cases of a special relationship between the parties] is merely the conduct of the reasonable person of ordinary prudence under the circumstances....").

erty managers. Nor do we address the question of whether these defendants may be held to the "superior attributes" of a CPM-trained employee when that employee has voluntarily improved his skills beyond the requirements set forth by the defendant-employer for his position. We need not reach these issues because here the acts of Johnson that appellants contend were worthy of an eviction notice by a CPM exercising good principles of property management took place in 1974 and 1975. Yet Goodwin received his CPM certificate only in late 1976 or 1977. Goodwin (and by extension, Polinger and Park Southern), may not be held to the "superior attributes" of a CPM for events and alleged omissions that occurred prior to Goodwin's earning of his CPM certificate.

Although appellants were not entitled to an instruction on the existence of a profession of *CPM*-trained property managers, nevertheless we cannot ignore appellants' more basic concern: that they were entitled to a general professional negligence instruction based on the evidence they presented of the existence of a uniform standard of care and training in the property management field. The trial court refused to give such an instruction not because Goodwin had not yet earned a CPM certificate at the time of the events in question, but because the court believed that a professional negligence instruction was not appropriate on these facts. Appellants maintain that as a result of the trial court's refusal to instruct the jury that

appellees' conduct was to be judged according to prevailing standards of property management, the jury was led to believe that the amount of care owed to Dr. Sinai by appellees was more limited than the law requires. Appellants contend that the jury may have been misled by the trial court's general negligence instruction into thinking that the defendants' conduct was to be measured not against the conduct of those in the same trade or business, but according to what a reasonable layman would have done in the circumstances.

Since the amount of care owed a tenant by a landlord should be assessed by comparison with that amount of care normally exercised by other property managers, *Kline*, 141 U.S.App.D.C. at 379, 439 F.2d at 486,[16] we agree that if the court's instructions had the effect attributed to them by appellants, they would be erroneous. Considering the instructions as a whole, however, as we must,[17] we find it unlikely that the jury would have misunderstood the charge in the manner contemplated by appellants. The instruction given by the trial court was as follows:

Negligence is failure to exercise ordinary care. Negligence is doing something a person using ordinary care would not do or not doing something that a person using ordinary care would do. Ordinary care is that caution, attention or skill that a reasonable person would use under similar circumstances. The standard of care, as I told you, is a person using

16. See also *D.C. Transit Sys., Inc. v. Carney*, supra note 15, 254 A.2d at 403 (holding common carrier to "a duty of care commensurate with the particular hazards involved, i.e., all the care and caution which a bus driver of reasonable skill, foresight, and prudence could be fairly expected to exercise"); *Washington Hosp. Center v. Butler*, 127 U.S.App.D.C. 379, 383, 384 F.2d 331, 335 (1967) (those engaging in activities requiring unique knowledge and abilities must exercise degree of care commensurate with their undertaking); *Kight v. Metropolitan R.R. Co.*, 21 App.D.C. 494, 510 (1903) ("[t]he test of care or skill required in [a trade] is the ordinary usage and methods that obtain and are observed in the particular business, as practiced by the average prudent man, professing knowledge of

the business"); *Washington Asphalt Block & Tile Co. v. Mackey*, 15 App.D.C. 410, 426 (1899) ("the unbending test of negligence in methods, machinery and appliances is the ordinary usage of the business ... the fair average of his profession or trade").

17. The trial court's charge "is not to be tested in isolated segments"; the question "is whether the charge as a whole was fair and adequate." *District of Columbia v. Barnard*, 144 A.2d 418, 420 (D.C.1958); see *Henderson v. Allison*, 44 A.2d 220, 222 (D.C.1945) ("'[T]he charge to the jury cannot be considered piecemeal; it must be viewed in its entirety'") (citing *Coleman v. Chudnow*, 35 A.2d 925, 926 (D.C.1944)).

ordinary care. It is not that care exercised by a person that uses extreme caution or exceptional skill. We do admire exceptional skill and encourage it. But the law does not demand it as a general standard. The standard is the standard of ordinary care under all of the circumstances.

Obviously, that's a relative concept. A reasonable person changes his conduct according to the circumstances and according to the danger that he or she knows to exist. Therefore, as danger increases a reasonable person acts more careful[ly].

■ This instruction correctly set forth the law in this jurisdiction that there is only one standard of care, that of "ordinary care under all of the circumstances," and that the amount of care owed a plaintiff by a particular defendant is "a relative concept" that changes "according to circumstances." Appellants believe that the use of the word "person" would have led the jury to believe that the defendants were to be held to that degree of care required only of any reasonable person with no special training or experience in the property management business. Reading this section of the charge in isolation, we agree that the instruction would have been more precise had it specified not only that the degree of care required varies by circumstance, but that in this particular case the "circumstances" involve a trade of property management with certain principles and standards established by the evidence against which the conduct of the defendants here was to be measured.

When this instruction is read in context, however, the possibility of ambiguity on this score becomes negligible. Following the above-cited general definition of negligence, the trial court set forth the special duty of care owed by a landlord to his tenants:

I instruct you that the landlord of a multi-unit apartment dwelling owes to the tenant ... a duty of reasonable care to provide protection against foreseeable acts of third parties, including tenants.

The court then went on to define the standard of conduct which, on these facts, was required of the defendants to satisfy this duty:

[O]wners and landlords ... must ... use reasonable care in the operation of their buildings to provide protection from the foreseeable acts of third persons....

Further, with regard to using reasonable care, I instruct you that a landlord has a duty to make himself aware of the condition on the premises, including the activities of the tenants, which would affect the safety and well being of other tenants.

. . . . .

[T]he landlord has a duty to protect his tenant from a lessee who is known to present a serious threat or danger to others.

This language makes it clear to the jury that the law imposes upon the landlord special duties to his tenants beyond that which would be required of a mere layman, and it defines the nature of those duties in accordance with the law in this jurisdiction. The jury was informed that the "circumstances" by which the amount of care owed by the defendants is to be measured include a landlord with a special duty to his tenants and a corresponding degree of care required of him to conform to that duty.

Additional language in the trial court's instructions addressed the plaintiffs' claim that the landlord had departed from the standard of care by negligently failing to evict Johnson. After instructing the jury on the legal bases for evicting a tenant, the trial court said:

If you find that Johnson committed acts which could be the basis for termination of the tenancy, you go on to determine whether Defendants failed to exercise ordinary care in all of the circumstances and negligently failed to terminate the tenancy.

The "ordinary care in all of the circumstances" that the defendants are required

to exercise in order to avoid a negligence verdict can only be defined here by reference to the quantum of care normally exhibited by landlords in similar circumstances, which was established by plaintiffs' evidence. Should the jury have found accurate the plaintiffs' version of the prior firearms and other abnormal incidents in which Johnson allegedly was involved, it would have been well able to determine the extent of the care required of the defendants "in all of the circumstances"; for six witnesses testified as to the principles of good property management prevalent in the community. In order to find appellants' argument persuasive, we would have to find that the jury instructions here served in effect to remove this evidence—whose presentation involved approximately half the total trial time—from the jury's consideration. We do not read the instructions to have had this effect, and find that taken as a whole the instructions were adequate to inform the jury of the standard of care.

### III.

The Sinais' final contention on appeal is that the trial court erred in admitting certain testimony and photographs into evidence.

■ The defendants called James Gardiner, chairman of the District of Columbia Mental Health Commission, who was permitted to testify (over the plaintiffs' objections by way of a motion in limine and again at trial) as to the procedural difficulties of obtaining a civil commitment in the District of Columbia. We agree with appellants that this evidence was irrelevant and should not have been admitted, because it does not relate logically to any fact that was in issue in this case. There was no claim by the Sinais that the defendants were negligent because they had failed to have Johnson civilly committed. Although they have identified the error, appellants have pointed to no prejudice from this error to their case. We think it most likely that the jury simply ignored this evidence, since it had no bearing upon any of the issues

here at stake, and therefore we find this error to be harmless.

The photographs that were admitted into evidence were taken by a photographer in an attempt to reproduce the view of Johnson's balcony, as seen by George Barnes, the Park Southern custodial supervisor. Barnes purportedly saw Johnson shooting a gun from his balcony. The photographs were taken from the spot in which Barnes was standing, and were calibrated to reflect what a human eye would see from that position. The subject of the photos was defense counsel, who stood on Johnson's balcony holding various objects. The defendants offered these photographs to demonstrate to the jury that Barnes would have had difficulty seeing an object the size of a gun from his position.

Appellants argue that an insufficient foundation was laid for the admission of these photographs because they were taken in February, and the alleged shooting incident witnessed by Barnes took place in July. Since the angle of the sun is different in February than in July, they contend, the photos were not necessarily an accurate reproduction of what Barnes actually saw. They maintain, in addition, that since the time of day and lighting conditions for the two events may have differed, the trial judge should not have admitted the photographs into evidence.

■ Since the trial court " 'is in the best position to determine whether [photographs] properly reflect the testimony or the circumstances sought to be depicted,' " *March v. United States,* 362 A.2d 691, 704 (D.C.1976) (citation omitted), the decision whether to admit photographic evidence is committed to the court's sound discretion, and the decision to admit such evidence will be reversed only for an abuse of discretion. *Rich v. District of Columbia,* 410 A.2d 528, 531 (D.C.1979). The guidelines to be followed by the court in making this determination "are quite broad." *Id.* Photographs are admissible "even when they contain points of difference between the time of taking and the time of the accident

or injury, provided such differences are disclosed by the testimony and made clear to the jury." *Washington Coca Cola Bottling Works, Inc. v. Kelly*, 40 A.2d 85, 87 (D.C.1944).

██ Here, the photographer testified that he took the photographs at noon on a clear day in February, representing the best visibility conditions available on a winter day. (In contrast, we know nothing about visibility conditions on the July day in which Barnes supposedly saw the shooting.) The jury was made aware of the "points of difference" between the photographs and the actual event: that the photos were taken in February and the alleged shooting from the balcony had taken place in July. Appellants do not dispute the fact that the photographs were taken from the position in which Barnes said he was standing on the day on question, that defense counsel was in fact standing on Johnson's balcony, and that the photographs accurately represented Barnes' point of view. (In fact, since Barnes testified that his eyesight was not good, the camera's sight may have been more trustworthy than Barnes'.) We find no abuse of discretion in the trial court's decision to admit the photographs as a sufficiently accurate representation of the event in question.

*Affirmed.*

NEBEKER, Associate Judge, concurring:

Appellants raise objections to, among other things, the trial court's instructions on assumption of the risk and contributory negligence. It is well settled that appellants bear the burden of affirmatively establishing prejudicial error. *Goldstein v. Kennedy*, 134 A.2d 580, 581 (D.C.1957); D.C.Code § 11–721(e) (1981). In this case, however, the Sinais are unable to demonstrate prejudice, assuming error, as the jury returned a general verdict. Despite this, the majority assumes the jury did reach the questions of contributory negligence and assumption of the risk. It then goes to great lengths in discussing these issues.[1] But where, as here, there was a genuine question regarding primary negligence, it is entirely possible that the jury never even reached the issues presented by the instructions. Instead, the jury may simply have found that the defendants were not negligent.

The general verdict shrouded the decision of the jury in darkness. Appellants "might have dissipated that darkness by asking [pursuant to Super.Ct.Civ.R. 49(b) ], for a general verdict accompanied by the jury's answers to interrogatories." *Foster v. Moore-McCormack Lines*, 131 F.2d 907, 908 (2d Cir.1942), *cert. denied*, 318 U.S. 762, 63 S.Ct. 560, 87 L.Ed. 1134 (1943). Had interrogatories been used, we would know specifically what the jury found and whether they even considered the defenses asserted by appellees. *See American Oil Co. v. Hart*, 356 F.2d 657, 659 (5th Cir. 1966). The use of interrogatories is warranted precisely because they do help to focus the relevant issues for an appeal. *See E.L. Cheeney Co. v. Gates*, 346 F.2d 197, 200 (5th Cir.1965) ("everything was wrapped in the enigma of a general verdict....").

Super.Ct.Civ.R. 51 places the burden on counsel to propose desired jury instructions to the trial judge. Here trial counsel failed to request that special interrogatories be submitted to the jury. While it is true that the trial court might have rejected counsel's proposed queries, appellants would then have been able to preserve an objection to the failure to direct answer to specific questions. *See, e.g., Bartak v. Bell-Galyardt & Wells, Inc.*, 629 F.2d 523, 528 (8th Cir.1980). Rule 51 is quite applicable to Rule 49(b) verdicts. *Jonnel Enterpris-*

---

1. This case is distinguishable from *Lewis v. Washington Metropolitan Area Transit Authority*, 463 A.2d 666 (D.C.1983), which involved a complete failure to instruct, rather than an erroneous instruction, on a certain issue. We seem to read the court's holding there to mean that where there is a general verdict, this court may, but is not required to, presume prejudice in the event of an instructional error.

es, Inc. v. Dollar Savings Bank of New York, 624 F.2d 398, 402–03 (2d Cir.1980).

I believe it is time that busy appellate courts place responsibility for litigation where it belongs—with counsel. It is they who should, to coin a phrase, "lawyer their cases." Neither trial nor appellate judges should have to assume that responsibility. For a long time appellate courts have, in the interest of justice, excused or ignored failure of counsel to be precise in objections, legal and constitutional arguments, jury instruction proposals and objections, and verdict forms.[2] In so doing, appellate courts have assumed that issues have been preserved when the precise point was not raised at trial. They also are, as we have been in this case, willing to decide complex questions on an unproved assumption of prejudice when none may exist. The rules of procedure provide tools to the lawyer so that only cases requiring decision need be confronted. By decisions like this one we discourage use of those rules and add intolerable delay to the decision of cases squarely presenting issues requiring decision. In the interest of justice we are now obliged to require greater precision to reduce backlog.

We have recently held, in the context of a motion for relief from judgment, that this court will not leniently indulge legal mistakes of counsel. We said, and it should serve as a reminder to us and the bar,

> However sympathetic we may be to the circumstances of this appeal, the imputation of acts and omissions of counsel to the client "is necessary for the orderly conduct of litigation." *Railway Express Agency* [*v. Hill*, 250 A.2d 923, 926 (D.C. 1969)]. To give a party in appellant's position a second chance would increase the burden on other litigants in the system, as well as on our already overtaxed courts. As the court stated in *Ohliger v. United States*, 308 F.2d 667, 667–68 (2d Cir.1962): "Counsel's carelessness cannot be excused by this Court if it is to

perform its obligation to other litigants whose cases are necessarily delayed by such conduct." In short, as a general proposition, the client, not the adversary or the court, must bear responsibility for retaining counsel who failed to understand the rules of court. The client's relief, if any is due, must come from the attorney.

*Lynch v. Meridian Hill Studio Apts., Inc.,* 491 A.2d 515, 520 (D.C.1985).

Appellants are unable to demonstrate prejudice and it is inefficient and wrong for this court to presume prejudice. *See Barrett v. Adkins Furniture Co.,* 43 A.2d 44, 45 (1945). Accordingly, I concur in the result only.

---

**2.** We have been particularly indulgent with failure to properly plead in opposition to summary

judgment. This also adds gratuitously to the delay in both the trial and this court.